Hattie M. BLUNT, Plaintiff-Appellant,

v.

MARION COUNTY SCHOOL BOARD et al., Defendants-Appellees.

No. 74–1279.

United States Court of Appeals, Fifth Circuit.

July 14, 1975.

Clyde Ellis, Gainesville, Fla., Kent Spriggs, Tallahassee, Fla., John F. Welch, Ocala, Fla., for plaintiff-appellant.

John P. McKeever, Ocala, Fla., for Marion County School Bd.

Herbert D. Sikes, Charles E. Miner, Jr., Tallahassee, Fla., for State Bd. of Education.

Clinton H. Coulter, Jr., Gen. Counsel, Dept. of State, Tallahassee, Fla., for Richard Stone.

Larry Levy, Gen. Counsel, Office of the Comptroller, Tallahassee, Fla., for Fred O. Kickinson, Jr.

Robert Shevin, Atty. Gen., Tallahassee, Fla.

Before RIVES, WISDOM and COLEMAN, Circuit Judges.

COLEMAN, Circuit Judge:

In May, 1969, on grounds of incompetency the school board of Marion County, Florida, terminated the employment contract of Mrs. Hattie M. Blunt, a black school teacher of some twenty-five years experience. Unsuccessful in an administrative appeal from the school board decision,[1] Mrs. Blunt initiated this civil rights suit,[2] challenging the constitution-

---

1. Mrs. Blunt first took an appeal to the Florida State Board of Education. When this agency affirmed the decision of the Marion County School Board, she filed a petition for writ of certiorari in the Florida First District Court of Appeal. In April, 1973, the First District Court of Appeal affirmed the ruling of the State Board of Education. Blunt v. State Board of Education, Fla.App.1973, 275 So.2d 303.

2. In her amended complaint, Mrs. Blunt based federal jurisdiction on 42 U.S.C.A. §§ 1981–83 and 28 U.S.C.A. § 1343(3). However, the alleged violations of civil rights were limited almost entirely to claims under 42 U.S.C.A. § 1983 and 28 U.S.C.A. § 1343(3). These sections provide:

42 U.S.C.A. § 1983 (1970). Civil action for deprivation of rights.

Every person, who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the ju-

ality of her dismissal. She alleged that in the course of proceedings before the Marion County School Board and the Florida State Board of Education certain of her constitutional rights had been violated. Specifically, her claims ran as follows:

(1) The evidence before the Marion County School Board was, in a constitutional sense, insufficient to support a finding of incompetency. Thus, says Mrs. Blunt, she was dismissed on arbitrary and capricious grounds in violation of substantive due process;

(2) The dismissal was the result of an effort on the part of the Marion County School Board to voluntarily desegregate its faculties. Under these circumstances, the school board was under an obligation to prove that Mrs. Blunt was incompetent as compared to all other teachers in the system—a burden which the school board had failed to carry; and

(3) She was denied procedural due process in the course of the administrative proceedings before the Florida State Board of Education.

The relief sought was reinstatement of Mrs. Blunt's teaching contract, along with back pay and accrued retirement benefits.

After a bench trial before the District Court for the Middle District of Florida, judgment was entered in favor of the Marion County School Board and the State Board of Education on the basis of failure of proof, Blunt v. Marion County School Board (M.D.Fla., 1973), 366 F.Supp. 727.

We affirm the judgment of the District Court in all respects.

### The Substantive Due Process Claim

The essence of Mrs. Blunt's substantive due process claim is that the evidence presented to the Marion County School Board was insufficient to support a finding of incompetency. A review of the transcript of the testimony presented at her dismissal hearing in May, 1969 supplies the following facts:

Prior to her dismissal at the close of the 1968–69 school year, Mrs. Blunt had taught elementary education in the Marion County school system for twenty-five years. During the 1968–69 term she was employed as a second grade teacher at Fessenden School under a "continuing contract". Under this contractual agreement, Mrs. Blunt could not be dismissed except for "good and sufficient reasons".[3] Further, if a dismissal recom-

---

risdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

28 U.S.C.A. § 1343(3). Civil rights and elective franchise.

The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

\* \* \* \* \* \*

(3) To redress the deprivation, under color of any State *law*, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; . . . .

3. The applicable statute dealing with the dismissal of continuing contract teachers is Fla. Stat. § 231.36(4) (Supp.1975), which provides:

(4) Any member of the district administrative or supervisory staff and any member of the instructional staff, including any principal, who is under continuing contract, may be dismissed or may be returned to annual contract status for another three (3) years in the discretion of the school board, when a recommendation to that effect is submitted in writing to the school board on or before April 1 of any school year, giving good and sufficient reasons therefor, by the superintendent, or by the principal if his contract is not under consideration or by a majority of the school board. The employee whose contract is under consideration shall be duly notified in writing by the party or parties preferring the charges at least five (5) days prior to the filing of the written recommendation with the school board, and such notice shall include a copy of the charges and the recommendation to the school board. If the employee, upon being officially notified in writing by the school board that it will consider the charges filed against him

mendation was made, she was entitled to notice and a hearing before contract termination could become effective.

Throughout the 1968–69 school year Mrs. Blunt's teaching performance was observed by three supervisors: Mr. Eugene Broxton, the principal at Fessenden School; Mrs. Margaret Cody, the assistant principal in charge of elementary education at Fessenden; and Mrs. Marie Keeney, early childhood coordinator for the Marion County school system. As early as October, 1968, Mr. Broxton, Mrs. Cody, and Mrs. Keeney agreed that Mrs. Blunt's performance was not sufficient to meet the educational needs of her children. On November 7, Mrs. Keeney submitted a written evaluation of Mrs. Blunt's work, which was reviewed with Mrs. Blunt by Mr. Broxton and Mrs. Cody. Mrs. Blunt was hostile to the criticisms set forth in the evaluation, and she displayed an unreceptive attitude to the assistance offered by her supervisors. On November 12, 1968, Mr. Broxton sent Mrs. Blunt a letter detailing the deficiencies noted in Mrs. Keeney's evaluation and offering assistance for the improvement of her teaching techniques.

Further evaluations of Mrs. Blunt's work were made on November 20 and December 5, neither of which indicated any substantial improvement in her instructional technique. These were followed by a letter from Mr. Broxton, dated December 12, in which he stated that Mrs. Blunt would have to improve in her performance or else a recommendation would be made for her dismissal. Thereafter, Mrs. Blunt continued to exhibit the same belligerent attitude toward offers of assistance from her supervisors, so, in March, 1969, Mr. Broxton recommended that she be dismissed. In a letter to the Marion County School Board dated March 25, 1969, Mr. Robert Dunwoody, superintendent of schools for Marion County, detailed the charges which prompted the recommendation for Mrs. Blunt's dismissal:

Mrs. Blunt has exhibited inadequate knowledge of subject matter. She has not exhibited good teaching practices in the conduct of her classes. As a direct result of poor planning and poor organization, student motivation has been poor. Her management of students and class discipline has not met acceptable standards.

In due course, the school board scheduled a hearing on Mrs. Blunt's dismissal for May 7, 1969. On May 2, Mrs. Blunt's attorney was provided with a bill of particulars respecting the charges against Mrs. Blunt.[4]

---

wishes a public hearing, he shall notify the board in writing within ten (10) days after the date of the official notice. Upon receiving such a request, the school board shall within ten (10) days notify the teacher of the time and place of the public hearing. In the event the teacher does not request a public hearing, the school board shall proceed to take appropriate action. Any decision adverse to the employee shall be made by a majority vote of the full membership of the school board. Any such decision adverse to the employee may be appealed by him in writing to the department of education, through the commissioner of education, for review; provided such appeal is filed within thirty (30) days after the decision of the school board, and provided further that the decision of the department shall be final as to sufficiency or insufficiency for discontinuation of the continuing contract status.

4. The bill of particulars set forth the following specific charges of teaching deficiencies:

"1. Academics:
　a. Unable to teach students of varying abilities.
　b. Poor planning, both daily and long range.
　c. Improper grammer, both written and spoken.
　d. Numerous spelling errors which students copy.
　e. Communication with students is poor.
　f. Inadequate use of audio-visual aids.
　g. Handwriting style is inadequate.
　h. Mathematics, English and Reading teaching styles are inadequate.
　i. Refuses aid and assistance from principal, assistant principal, other teachers and supervisors.
"2. School Regulations:
　a. Records are not kept properly, including planning books and student records.
　b. Student records are not accurate.
　c. Refuses to sign evaluation sheets.

At the May 7 hearing Mr. Broxton, Mrs. Cody, and Mrs. Keeney testified on the instructional deficiencies they had observed in Mrs. Blunt's teaching performance during the 1968–69 school year. Each of these witnesses had visited Mrs. Blunt's classroom on numerous occasions throughout the school year,[5] and all of them noted essentially the same shortcomings with respect to Mrs. Blunt's performance. The cumulative effect of their testimony revealed the following points:

(1) Mrs. Blunt exhibited poor organizational skills with respect to her utilization of group teaching techniques. Although she attempted to divide her class into groups to teach certain subjects, she failed to use this technique in an efficient manner. While teaching one group of students, she would leave the remaining students idle without an assignment.

(2) Mrs. Blunt's speech was at times difficult to understand. She had the habit of covering her mouth with her hand when she spoke, and, as a result, her speech was often muffled and unintelligible.

(3) Mrs. Blunt employed poor grammatical usage in her speech, and her grammatical errors were repeated by her students. Her most common grammatical mistake was the frequent use of double negatives.

(4) Mrs. Blunt misspelled words which she wrote on the blackboard, and, in turn, her students would copy these words.

(5) Mrs. Blunt exhibited poor writing techniques, which, in turn, were reflected in her students' work. She would often use capital letters improperly, and she failed to employ proper spacing between words which she wrote on the blackboard.

(6) Mrs. Blunt exhibited instructional deficiencies in the teaching of math, phonics, and spelling. She employed a confusing and improper technique in teaching her children subtraction, she made improper use of the "little word" technique in teaching phonics, and she attempted to teach spelling when the children had not mastered the letters of the alphabet.

(7) Mrs. Blunt exhibited inadequate skills in the use of audio-visual aids. She did not use these aids sufficiently, and when she did use them, she did so in an improper manner. On one occasion, Mrs. Blunt was observed while using a film strip, and she "half framed" the entire film.

(8) Mrs. Blunt failed to keep up to date in handling administrative matters, grading papers, and maintaining a plan book. She failed to keep proper health records on her students, and in one instance she allowed a child who was supposed to be in the third grade to remain in her class for three months before advancing him. She was far behind in grading work submitted by her students, and thus her students were not given timely feedback on their progress. Her plan book was kept in a disorderly and deficient manner.

(9) As a probable result of Mrs. Blunt's instructional deficiencies, many of her students were placed in lower ability groups when they were advanced to the third grade and even to the fourth grade. Her students were unable to keep up with those students

d. Allows teacher's aid to conduct actual classroom teaching.
e. School reports are submitted late."

**5.** Mr. Broxton testified that he made at least five formal visits to Mrs. Blunt's classroom during the 1968–69 term for purposes of observing her teaching techniques and ability. On each of these visits he would observe her performance for a period of 30–40 minutes.

Mrs. Cody testified that at least twice a week during the 1968–69 school year she would visit Mrs. Blunt's classroom and stay for a substantial period of time to observe her performance.

Mrs. Keeney testified that she made five formal visits to Mrs. Blunt's classroom during the 1968–69 school year. On each of these visits she would spend between thirty minutes and two hours observing Mrs. Blunt's performance.

who had other second grade teachers at Fessenden, when they were promoted to higher grades.

(10) Mrs. Blunt exhibited hostility to her supervisors when they offered assistance to improve her performance. On one occasion, Mrs. Blunt told Mr. Broxton that she did not need his help and that she did not want him to visit her classroom.

To contradict this testimony, Mrs. Blunt testified that none of her supervisors had ever called her attention to the fact that she misspelled words, nor had anyone informed her that her plan book was inadequate. Further, she denied that she covered her mouth when she spoke or that she had been hostile to offers of assistance.

But perhaps the most crucial aspect of Mrs. Blunt's case was that she had always received satisfactory evaluations in the past, and that Mr. Broxton himself had rated her a competent teacher for the five school years immediately preceding the 1968–69 term. On cross examination by Mrs. Blunt's attorney, Mr. Broxton explained this seeming inconsistency in his evaluations of Mrs. Blunt's work. He stated that he had never considered Mrs. Blunt a competent teacher, but he had nevertheless rated her satisfactorily in the past because he felt that she had performed to the best of her limited ability. He characterized Mrs. Blunt as an adequate supervisor of children but an inadequate teacher. As a further explanation of why he had not recommended that Mrs. Blunt be dismissed in past years, Mr. Broxton noted that, prior to the 1968–69 term, replacement teachers had not been available, due to a limited job market and low teachers' salaries in the Marion County school system. These conditions changed in 1968–69, and, therefore, when Mrs. Blunt showed no interest in improving her performance, Broxton recommended that she be dismissed.

After hearing all of the foregoing evidence, the Marion County School Board voted unanimously to terminate Mrs. Blunt's employment contract. Mrs. Blunt then perfected an administrative appeal to the Florida State Board of Education, which ultimately affirmed the decision of the school board. Subsequently, a petition for writ of certiorari was filed in the Florida First District Court of Appeal, where relief was denied. Blunt v. State Board of Education (Fla.App., 1973), 275 So.2d 303. Failing in her efforts in the Florida judicial system, Mrs. Blunt brought this civil rights suit in federal court under 42 U.S.C., § 1983, raising constitutional issues not submitted to or decided in the state court litigation, see, e. g., England v. Louisiana State Board of Medical Examiners, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964).

▇ Our judicial review of Mrs. Blunt's claim that in her dismissal by the Marion County School Board she was denied substantive due process is circumscribed. For sound policy reasons, courts are loathe to intrude upon the internal affairs of local school authorities in such matters as teacher competency. Ferguson v. Thomas, 5 Cir. 1970, 430 F.2d 852, 858; Callahan v. Price, 5 Cir. 1974, 505 F.2d 83, 88; Lee v. Macon County Board of Education, 5 Cir. 1974, 490 F.2d 458, 460. Nevertheless, conceding that Mrs. Blunt held a "property" interest in her teaching contract worthy of due process protection,[6] the issue is whether substantial evidence supports the school board's finding of incompetency. Ferguson v. Thomas, *supra.*

▇ Mrs. Blunt contends that her case falls within the range of Johnson v. Branch, 4 Cir. 1966, 364 F.2d 177, cert. denied, 385 U.S. 1003, 87 S.Ct. 706, 17 L.Ed.2d 542 (1967), where the Fourth Circuit held that minor infractions of school rules would not suffice to support

---

**6.** *See* Perry v. Sinderman, 1972, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570; Board of Regents v. Roth, 1972, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548; Collins v. Wolf-

son, 5 Cir. 1974, 498 F.2d 1100, 1104; Ferguson v. Thomas, 5 Cir. 1970, 430 F.2d 852, 855–56.

a teacher's dismissal when due process interests are at stake. Mrs. Blunt claims that the evidence presented to the Marion County School Board can, at the worst, be interpreted as indicating only minor teaching deficiencies on her part. We must disagree.

The testimony of Mrs. Blunt's supervisors at the school board hearing with respect to her incompetency was not only substantial, it was devastating. The only real question confronting the members of the board was that of determining whose testimony was credible. The members credited the testimony of the witnesses who appeared on behalf of the superintendent of schools. They rejected the testimony of Mrs. Blunt. The unavoidable result is that the decision of the Marion County School Board is supported by substantial evidence, and there was no lack of substantive due process.

### The Equal Protection Claim

The second aspect of Mrs. Blunt's attack on her dismissal deals with the claim that she was discharged as a result of the school board's effort to voluntarily desegregate public school faculties in Marion County. The relevant facts are as follows:

In the spring of 1968, the superintendent of schools for Marion County issued a directive that all public schools in the county were to work toward desegregating their faculties. The goal sought in this desegregation effort was the eventual achievement in all schools of a two to one ratio of white to black teachers—a ratio compatible with HEW guidelines. During the 1967–68 school year, the faculty at Fessenden School was composed of 49 black teachers and only 2 white teachers.

In an effort to comply with the superintendent's directive, Mr. Broxton asked the teachers at Fessenden to attempt to find positions in other schools where the faculties had theretofore been predominantly white. Under this arrangement, when the teachers reported back to Mr. Broxton that they had obtained positions elsewhere, he would then attempt to fill the vacancies created.[7] Mrs. Blunt made no substantial effort to secure a position in another school, despite Mr. Broxton's request that she do so. Nevertheless, she was retained at Fessenden for the 1968–69 school year, at which time the ratio of white to black teachers was one to one.

During the process of the desegregation effort, the superintendent of schools for Marion County was committed to the principle that no teacher should be discharged in order to achieve the ratio established by HEW. Apparently this policy was adhered to, for no evidence was presented in the District Court that any faculty members were terminated in 1968 in order to advance the desegregation plan.

Because the desegregation effort at Fessenden had been so successful in the spring of 1968, Mr. Broxton determined that in the spring of 1969 no teacher transfers would be required in preparation for the 1969–70 school year. Instead, he felt that the target ratio of two white faculty members to each black member could be accomplished through the normal processes of attrition.

At the trial below, Mr. Broxton testified that Mrs. Blunt's lack of cooperation with respect to his desire to implement faculty desegregation at Fessenden was a factor taken into account by him in his evaluation of her work during the 1968–69 school year. He added, however, that she was not discharged because of this attitude.

In deciding the issue of whether Mrs. Blunt's dismissal was motivated by racial considerations, the District Court found

---

7. The essential concept embodied in Mr. Broxton's desegregation plan was the achievement of the target ratios by means of the voluntary relocation of faculty members. Under this plan no teachers were dismissed in order to create vacancies. Instead, as teachers relocated, vacancies would arise and Mr. Broxton would attempt to fill these vacancies with suitable white teachers.

that Mrs. Blunt's discharge was not designed to create a vacancy at Fessenden School which would permit further implementation of the faculty desegregation plan then in progress in the Marion County schools. Instead, the Court concluded that Mrs. Blunt's dismissal was undertaken "solely because of a conviction on the part of Mr. Broxton and the members of the Marion County School Board that the plaintiff was not competent to meet the modern demands of teaching". Blunt v. Marion County School Board, M.D.Fla.1973, 366 F.Supp. 727, 730.

In testing Mrs. Blunt's claim that she was dismissed for reasons of race, we apply the standards set forth in United States v. Jefferson County Board of Education, 5 Cir. 1967, 380 F.2d 385, cert. denied sub nom., 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103.[8] In *Jefferson*, we stated that when desegregation is implemented by court order—

> Teachers and other professional staff members may not be discriminatorily assigned, dismissed, demoted, or passed over for retention, promotion, or rehiring, on the ground of race or color. In any instance where one or more teachers or other professional staff members are to be displaced as a result of desegregation, no staff vacancy in the school system shall be filled through recruitment from outside the system unless no such displaced staff member is qualified to fill the vacancy. If, as a result of desegregation, there is to be a reduction in the total professional staff of the school system, the qualifications of all staff members in the system shall be evaluated in selecting the staff member to be released without consideration of race or color. 380 F.2d at 394.

Mrs. Blunt argues that under *Jefferson* the Marion County School Board was obligated to compare her qualifications with those of all other teachers in the system before she could be dismissed. However, Mrs. Blunt has failed to prove sufficient facts to bring her case under the *Jefferson* umbrella. In order for the *Jefferson* requirement of system-wide qualification comparisons to be activated, a showing must be made that the total professional staff is being reduced as a result of desegregation. In the case at bar, there was no indication whatsoever that cuts were made in the total professional staff of the Marion County School system in order to accomodate the desegregation effort. In fact, to the contrary, the superintendent of schools specifically stated that it was his policy that no teachers would be terminated in order to achieve the target ratios. Under these facts, Mrs. Blunt's claim must fail.

Turning next to the issue of whether Mrs. Blunt was dismissed on account of her race, we find ourselves in total agreement with the view of the District Court that considerations of race played no part in her discharge. This conclusion is borne out by the testimony of all the witnesses who appeared at the trial below, except for Mrs. Blunt. Choices of credibility are within the discretion and prerogative of the trial court, and will not be overturned by appellate second-guessing.

In addition, the charges which led to Mrs. Blunt's dismissal contained no mention of racial considerations, nor did the testimony heard by the school board reflect any bias toward Mrs. Blunt because of her unwillingness to participate in the school desegregation effort. The net effect of this leads us to conclude that the

---

8. The standards set forth in Singleton v. Jackson Municipal Separate School District, 5 Cir. 1970, 419 F.2d 1211, cert. denied, 396 U.S. 1032, 90 S.Ct. 612, 24 L.Ed.2d 530, do not apply to the case at bar, because *Singleton* has been given a non-retroactive effect. *See* Lee v. Macon County Board of Education, 5 Cir. 1971, 453 F.2d 1104, 1112–14.

Since *Singleton* does not control this case, the appropriate judicial standard is United States v. Jefferson County Board of Education, *supra*, which was the immediate predecessor of *Singleton* in this Circuit.

fact that Mrs. Blunt's dismissal occurred simultaneously with the faculty desegregation campaign in the Marion County schools was purely a matter of coincidence—and not an operation of cause and effect.

### Procedural Due Process Claims

The final thrust of Mrs. Blunt's constitutional attack is that she was denied procedural due process in the course of proceedings before the State Board of Education. On this point she asserts three separate claims of constitutional impropriety.

(1) The State Board of Education unconstitutionally reopened her case and granted the Marion County School Board a rehearing.

(2) The Marion County School Board failed to file findings of fact in a timely manner after the dismissal hearing in May, 1969.

(3) The State Board of Education deprived her of "liberty" by circulating a report that she had been discharged under a statute which provides for the dismissal of teachers for engaging in certain opprobrious conduct.

To better understand the procedural setting of this case, a chronology of the proceedings before the State Board of Education will be helpful.

(1) May 7, 1969—Mrs. Blunt's dismissal hearing before the Marion County School Board. The board votes unanimously to terminate her employment contract.

(2) June 6, 1969—Mrs. Blunt appeals to the State Board of Education, pursuant to Fla.Stat. § 231.36(4).

(3) January 9, 1970—A hearing is held before George Georgieff, a hearing examiner appointed by the State Board of Education, to make preliminary findings in Mrs. Blunt's case. Georgieff enters a recommendation that Mrs. Blunt be reinstated for a one year probationary period in order to permit further and more extensive evaluations of her teaching ability.

(4) March 16, 1971—The State Board of Education takes up the matter of Mrs. Blunt's dismissal and votes to affirm the decision of the Marion County School Board. This action is taken without affording either side an opportunity to appear before the board and present arguments. In addition, in rendering its decision the State Board of Education relies upon Fla. Stat. § 231.36(6),[9] instead of Fla.Stat.

---

**9.** This statute deals primarily with dismissals of teachers for engaging in opprobrious conduct.

Fla.Stat. § 231.36(6) (Supp.1975):

(6) Any member of the district administrative or supervisory staff and any member of the instructional staff, including any principal, may be suspended or dismissed at any time during the school year; provided that no such employee may be discharged or removed during the school year without opportunity to be heard at a public hearing after at least ten (10) days' written notice of the charges against him and of the time and place of hearing; and, provided further, that the charges must be based on immorality, misconduct in office, incompetency, gross insubordination, willful neglect of duty, drunkenness, or conviction of any crime involving moral turpitude. Whenever such charges are made against any such employee of the school board, the school board may suspend such person without pay, pending a speedy hearing of such charges if requested by the employee, but if charges are not sustained he shall be immediately reinstated, and his back salary shall be paid. In cases of suspension by the school board or by the superintendent, the school board shall hold a public hearing if requested by the employee, after notice as above provided, to determine upon the evidence submitted whether the charges have been sustained and, if said charges are sustained, either to dismiss said employee or fix the terms under which said employee may be reinstated. If such charges are sustained by a majority vote of the full membership of the school board and such employee is discharged, his contract of employment shall be thereby canceled. If the employee is under continuing contract, any such decision adverse to him may be appealed by him in writing to the department of education, through the commissioner, for review; provided such appeal is filed within thirty (30) days after the decision of

§ 231.36(4),[10] the proper basis for Mrs. Blunt's appeal.

(5) November 7, 1971—Mrs. Blunt files a petition for a rehearing before the State Board of Education. In her petition she alleges the failure of the board to grant a hearing prior to its March 16 decision, and also the board's reliance upon the improper statute in affirming the decision of the Marion County School Board.

(6) January 11, 1972—The State Board of Education grants Mrs. Blunt's petition for rehearing. After hearing testimony from George Georgieff, the previously appointed hearing examiner, the State Board reverses its previous decision and reinstates Mrs. Blunt's contract.

(7) January 20, 1972—The Marion County School Board files a petition for rehearing before the State Board of Education. The school board alleges procedural defects in the previous rehearing in that the State Board of Education heard testimony from Georgieff in violation of Fla.Stat. § 120.28.[11]

(8) January 25, 1972—The State Board of Education, on its own motion, grants a rehearing in the case of Mrs. Blunt. Counsel for the Marion County School Board suggests that all prior orders in the Hattie Blunt case be vacated and the case remanded to the local school board to enter findings of fact. This motion is opposed by Mrs. Blunt, and the State Board ultimately decides only in favor of vacating all of its prior orders. A rehearing of the case is set for March 7, 1972, and the State Board determines that the only issue which it will decide is whether there was substantial evidence to support Mrs. Blunt's dismissal.

(9) February 8, 1972—The Marion County School Board meets in executive session, and, on the basis of the written transcript of Mrs. Blunt's May 7, 1969 dismissal hearing, enters findings of fact in connection with that hearing.

(10) March 7, 1972—The State Board of Education meets to rehear Mrs. Blunt's case. Counsel for the Marion County School Board moves to enter into the record the school board's recently prepared findings of fact. Counsel for Mrs. Blunt vigorously opposes this motion, and the State Board of Education declines to consider the school board's findings of fact. After hearing arguments on the substantive issues involved in Mrs. Blunt's case, the State Board votes to affirm the action taken by the Marion County School Board.

Thereafter, Mrs. Blunt filed a petition for writ of certiorari in the Florida First District Court of Appeal. Prior to deciding the case, the District Court of Appeals ordered that the findings of fact prepared by the Marion County School Board be made a part of the record. On April 5, 1973, the First District Court of Appeal denied Mrs. Blunt's petition for certiorari. The Court held that no violations of the Florida Administrative Procedure Act had occurred in the course of proceedings before the State Board of Education, and that there was substantial evidence to support Mrs. Blunt's dismissal, Blunt v. State Board of Education (Fla.App., 1973), 275 So.2d 303.

In view of the numerous hearings and rehearings which have been conducted with respect to Mrs. Blunt's dismissal as hereinabove described, it is difficult to imagine how she has been denied the full benefit of procedural due process.

> No hearing examiner shall, in any proceeding where he presided as hearing examiner or a factually related proceeding, participate or advise the agency in entering its order except through his recommended order.

---

the school board, and provided further that the decision of the department shall be final as to sufficiency of the grounds for dismissal.

**10.** See Footnote 3, *supra.*

**11.** Fla.Stat. § 120.28 (1973) *Separation of functions.*

■ Turning to her first claim, she asserts that the State Board improperly granted the Marion County School Board a rehearing. The sole basis for this attack is that the State Board gave no reason for granting the second rehearing. This position is wholly untenable position. In granting the County School Board a rehearing, the State Board was only allowing the local board the same procedure which it had previously accorded Mrs. Blunt. Further, in voting for the rehearing, several members of the State Board expressed the view that such a procedure would be necessary in order to avoid running afoul of the Florida Administrative Procedure Act. In essence, these members felt that a rehearing would be the only means of curing possible procedural defects which had occurred in prior proceedings.[12] Finally, the action taken by the State Board of Education on this point was held to be proper when Mrs. Blunt's case was reviewed by the Florida First District Court of Appeal, Blunt v. State Board of Education (Fla.App., 1973), 275 So.2d 303. In view of the above considerations, the decision by the State Board of Education to rehear Mrs. Blunt's case a second time was neither an abuse of administrative discretion nor an affront to the procedural fairness embodied in due process of law. See, United States v. Pierce Auto Freight Lines, Inc., 1945, 327 U.S. 515, 535, 66 S.Ct. 687, 697, 90 L.Ed. 821; Interstate Commerce Commission v. Jersey City, 1944, 322 U.S. 503, 514, 516, 64 S.Ct. 1129, 1134, 1135, 88 L.Ed. 1420; Kessler v. Strecker, 1939, 307 U.S. 22, 34, 59 S.Ct. 694, 700, 83 L.Ed. 1082, Low Wah Suey v. Backus, 1912, 225 U.S. 460, 32 S.Ct. 734, 56 L.Ed. 1165; United States ex rel. Adamantides v. Neelly, 7 Cir. 1951, 191 F.2d 997, 1000.

■ The second claim of denial of procedural due process is that the Marion County School Board failed to enter findings of fact in a timely manner after the May 7, 1969 dismissal hearing. This argument implies that procedural due process required the School Board to enter findings of fact after conducting the dismissal hearing. We need not reach or decide this point.

While Mrs. Blunt's appeal was pending before the State Board of Education, the County School Board, on February 7, 1972, made findings of fact based on the original hearing. These findings were not made a part of the record before the State Board but the Florida First District Court of Appeal ordered them incorporated in Mrs. Blunt's petition for certiorari and they are set forth in the opinion of the Court, 275 So.2d at 305, 306. Any disadvantage Mrs. Blunt may originally have incurred by not having findings was thus cured. The District Court of Appeal decided the question of the sufficiency of the evidence on the basis of these findings of fact and under appellant's theory of due process that is all that she was entitled to expect. Moreover, the United States District Court conducted its own evidentiary hearing and independently arrived at findings no different from those originally made.

■ The final procedural due process claim involves an allegation that Mrs. Blunt was deprived of "liberty" in the course of proceedings before the State Board of Education. Mrs. Blunt asserts that she was unjustly stigmatized by a report released by the State Board of Education, which stated that she had been dismissed under Florida Stat. § 231.36(6),[13] as opposed to Florida Stat. § 231.36(4),[14] the proper statutory basis

---

12. Several members of the State Board of Education feared that a violation of Florida Stat. § 120.28 (1973) may have occurred in the first rehearing of Mrs. Blunt's case, because at that proceeding the State Board had heard testimony from George Georgieff, the hearing examiner appointed to handle Mrs. Blunt's appeal. The above-mentioned Florida statute prohibits hearing examiners from testifying before ad-ministrative agencies with respect to cases to which they are assigned. The text of Florida Stat. § 120.28 is set out in Footnote 11, supra.

13. The text of Florida Stat. § 231.36(6) is set out in Footnote 9, supra.

14. For text of Florida Stat. § 231.36(4), see Footnote 3, supra.

for her discharge. Section 231.36(6) provides for dismissals of public school teachers for engaging in improper or opprobrious conduct, while Section 231.-36(4) deals with dismissals of continuing contract teachers in general. As support for the claim that her Fourteenth Amendment "liberty" was infringed by the State Board's erroneous report, Mrs. Blunt relies on Board of Regents v. Roth, 1972, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548.

In *Roth*, the Supreme Court held that a public employee's Fourteenth Amendment "liberty" interests may be affected if he is discharged in such a manner as to damage his standing in the community or impose a disability on his prospects for future employment. In cases where dismissal from public employment has such an adverse effect, minimum procedural due process safeguards come into play. Hence, notice and a hearing must be afforded the employee in order to properly effectuate his dismissal.

Even if the report released by the State Board of Education cast such a stigma upon Mrs. Blunt's reputation as to infringe her Fourteenth Amendment interest in "liberty", the question remains as to whether she was afforded the minimum requirements of procedural due process after the release of the report. Under the facts of this case we unhesitatingly conclude that she was.

The report, about which Mrs. Blunt complains, was released shortly after the initial decision of the State Board of Education in March, 1971. Subsequent to this decision, Mrs. Blunt filed a petition for rehearing in which she alleged *inter alia* that the State Board had decided her case on the basis of an inapplicable statute. The Board granted Mrs. Blunt's petition for rehearing and subsequently reversed its previous decision. Furthermore, at a later date the State Board vacated all orders which it had previously entered with respect to her case.

These steps afforded Mrs. Blunt adequate procedural due process. Whatever harm may have been visited upon her reputation, if any, by the State Board's initial order was subsequently cured by the later proceedings.

The judgment of the District Court is Affirmed.