**Richard K. HILLIS, Plaintiff,**

**v.**

**STEPHEN F. AUSTIN STATE UNIVERSITY et al., Defendants.**

**Civ. A. No. TU–75–360–CA.**

United States District Court,
E. D. Texas,
Tyler Division.

March 13, 1980.

---

Martha McCabe of Daves, McCabe & Crews, Tyler, Tex., and Thomas J. Griffith of Griffith & Brister, Lubbock, Tex., for plaintiff.

Susan J. Dasher and David Talbot, Asst. Attys. Gen., Austin, Tex., and Robert Provan, Staff Counsel for the University, Nacogdoches, Tex., for defendants.

ROBERT M. PARKER, District Judge.

This cause was tried to the Court, sitting at Tyler, Texas, with trial commencing on August 28, 1979. After two days of evidence and argument by counsel for the respective parties, the Court announced its decision to take the matter under advisement. In connection therewith, the Court requested briefs of counsel on the Eleventh Amendment immunity issue. Said briefs were duly submitted and reviewed by the Court in reaching its decision. After a review of the testimony and the relevant authorities, the Court finds for the Plaintiff in

connection with his claims under the First and Fourteenth Amendments to the United States Constitution and orders monetary and injunctive relief.

## I.

### The Facts

Richard K. Hillis accepted a teaching position at Stephen F. Austin State University, Nacogdoches, Texas, for a nine month period which began August 23, 1974. Dr. Hillis possessed a strong academic background for the regional university, having received his Doctor of Arts from the Carnegie Mellon University in 1973.[1] A review of his vitae, admitted as Plaintiff's Exhibit # 3, reveals impressive achievements as a practicing studio artist and as a critical writer in the field of art. The conclusion that he possessed a high degree of professionalism is supported by a review of the recommendation letters which are appended to his vitae. Dr. Hillis was an asset to Stephen F. Austin University.

The Art Department at Stephen F. Austin University had been conceived primarily as a training ground for art teachers in the primary and secondary schools. As the university grew, the direction of the Art Department expanded in scope. While a majority of art majors continue to concentrate in Art Education, Stephen F. Austin has matriculated a significant number of art majors with other career goals.

Dr. Hillis was part of the new wave in the Art Department. As a result of Dr. Hillis' integrity, high professional standards, and introduction of new teaching methods, a series of confrontations with Dr. Creighton Delaney, Chairman of the Art Department, ensued. It does not escape the Court's sense of irony that Creighton Delaney was the man chiefly responsible for Dr. Hillis' hiring.

On September 4, 1974, only six days after Dr. Hillis began teaching at Stephen F. Austin, he received a memorandum from Dr. Delaney. (Plaintiff's Exhibit 69) Dr. Hillis was teaching Art 300[2] in the Fall term of 1974. Art 300 was a design course for which studio hours were required. Dr. Delaney, in the September 4th memorandum, instructed Dr. Hillis to carry Kelly Perkins on his class roll for Art 300 and to give her a "B" for the course.[3] In accordance with Dr. Delaney's instructions, but still uncertain about them, Dr. Hillis listed Ms. Perkins on his twelfth day class roll.

The semester passed, and Dr. Hillis never saw Ms. Perkins in his class nor did he review her portfolio. The plaintiff made several attempts to speak to Dr. Delaney about Ms. Perkins. Dr. Delaney testified that he made the same attempt to speak to Dr. Hillis. In any case, the subject of Kelly Perkins and the September 4, 1974, memorandum was not discussed between Dr. Delaney and Dr. Hillis until sometime in early December, before the end of the Fall term and the final examination period.

The December meeting between Dr. Hillis and Dr. Delaney evidently turned into a heated debate. It was Dr. Hillis' position that he could not award a grade for a studio course to a student whose work he had never seen. Dr. Delaney's position was that as head of the Department his assessment of Ms. Perkins' work should be a sufficient guarantee of its quality to warrant the award of a "B". The disagreement over Ms. Perkins seemed to solidify the rift between the two educators, the new wave refusing to compromise his integrity to give way to the old.

Believing that Dr. Delaney would allow him to review the student's work before assigning the grade, Dr. Hillis gave Ms.

1. Dr. Hillis received a Bachelor's of Fine Arts from Ohio University in 1960 and a Master's of Fine Arts from the University of Arizona in 1967.

2. The first digit of a course number indicates its level with digit number 1 indicating a freshman level course.

3. In fairness, the memo stated that Ms. Perkins had received credit from another institution. However, Ms. Perkins had not, and Dr. Delaney had been the person who awarded her advanced credit.

Perkins a "WH", signifying that her grade was being withheld. Dr. Hillis did this even though he had given another student an "F" for excessive absences. Sometime after Dr. Hillis had turned in his grades, but before they were posted, Dr. Delaney changed the "WH" to a "B".

It was not until January 28, 1975, that Dr. Hillis learned of the grade change. By that time, Dr. Delaney had struck again. Dr. Hillis had been appointed to the graduate faculty on October 1, 1974. (Plaintiff's Exhibit 38) For the Spring Semester, Dr. Hillis had been assigned a graduate seminar course in research techniques in art, Art 550G. After a university approved trip to Washington, D. C., for an art conference, Dr. Hillis was reassigned to teach Art 100. Dr. Delaney took over the teaching responsibilities for Art 550G.

In response to his reassignment, Dr. Hillis initiated an airing of grievances through Dr. Fred Rodewald, a member of the American Association of University Professors, on January 28, 1975. It was through a conference between Rodewald, Delaney and Hillis that the grade change was revealed to the plaintiff. Plaintiff's Exhibit 8, a letter Dr. Hillis wrote to Dr. Bos, the President of AAUP at Stephen F. Austin, was dated January 28, 1975. This letter dealt exclusively with the reassignment. Plaintiff's Exhibit 9, another letter to Dr. Bos from Dr. Hillis, was written after the conference with Rodewald and Delaney. In Exhibit 9, Dr. Hillis protested the grade change as an infringement of his academic freedom.

A letter dated February 5, 1975, from Delaney informed Dr. Hillis that his teaching contract would not be renewed. (Plaintiff's Exhibit 11) Notably absent from the letter are any reasons for the failure to renew his contract. However, it was Dr. Delaney's own testimony at trial that established that the Kelly Perkins matter was not "insignificant" in the nonrenewal decision. The Court agrees with Dr. Delaney's assessment but carries it a step further; Dr. Hillis' protected activities in respect to Kelly Perkins were a motivating factor in the failure to renew Dr. Hillis' teaching contract.

Before entering legal findings with respect to the non-renewal, it is of some significance to note two other factual areas established at trial. Dr. Hillis made numerous attempts after February 5, 1975, to give the University an opportunity to resolve the matter itself. Among these were two separate requests for faculty senate hearings; both were denied. A Fine Arts Council Investigation Committee was empaneled to investigate the allegations of infringement of academic freedom, but the committee had no authority to deal with the question of non-renewal. Yet, the University felt sufficiently certain of its position to twice advise Dr. Hillis that he had exhausted his administrative remedies with respect to his non-renewal.

From the time of his non-renewal to the time evidence was heard in this case, Dr. Hillis made 286 applications to art-related employers. (Plaintiff's Exhibit 73) Dr. Hillis was rejected from consideration each time. At the trial of this case, Dr. Hillis had been employed by Texas Instruments in Lubbock, Texas, earning hourly pay. Before his employment with Texas Instruments, Dr. Hillis had worked as a manual laborer for the City of Lubbock. His total earnings from both employers over the four year period were $18,699.43. The parties stipulated that Dr. Hillis' salary for four academic years at Stephen F. Austin State University would have totaled $87,545.00.

## II.

### The Merits

■ A teacher does not surrender constitutionally protected rights of freedom of expression and petition for redress of grievances as a condition of public employment. *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Epperson v. Arkansas*, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968). This fundamental precept of public employment, entrenched as it is in the case law, requires the Courts to guard against its infringe-

ment by the public employer. While public entities are free to make personnel decisions, their freedom of decision may not exceed their constitutional authority. When a public employer exceeds its constitutional license, the employee has but one recourse, the Courts. After a review of the evidence in the instant case, the Court may draw only one conclusion. Stephen F. Austin has exceeded its constitutional license; the University has made a personnel decision for a constitutionally impermissible reason.

■ Richard Hillis engaged in a number of protected activities. First, and probably most important in terms of the employment consequences, he met with Dr. Delaney to discuss the Kelly Perkins directive. His criticism of the directive and request to review Ms. Perkins' portfolio were protected by the First Amendment. *Givhan v. Western Line Consolidated Independent School District*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979). Prior to being notified of his non-renewal, Dr. Hillis appealed to the AAUP for relief from infringement of his academic freedom. This he clearly had a right to do. *Mailloux v. Kiley*, 448 F.2d 1242 (1st Cir. 1971); *Kaprelian v. Texas Woman's University*, 509 F.2d 133 (5th Cir. 1975); *Grimm v. Cates*, 532 F.2d 1034 (5th Cir. 1976). Dr. Hillis' criticism of Dr. Delaney does not lose its protection simply because it was directed at or to his nominal superior. *Givhan, supra; Abeyta v. Town of Taos*, 499 F.2d 323 (10th Cir. 1974).

■ Having established that Dr. Hillis engaged in protected First Amendment activities, the Plaintiff was required to prove that the protected activities were a motivating or a substantial factor behind the non-renewal decision. *Mt. Healthy v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). The evidence at trial estab-

lished that one person, Dr. Creighton Delaney, had the authority to recommend non-renewal. Indeed, it was Dr. Delaney who exercised that power on February 5, 1975.[4] As previously noted, Dr. Delaney testified that the Perkins incident was not "insubstantial" in his decision to recommend non-renewal. The Court finds that the plaintiff successfully carried his *Mt. Healthy* burden.

■ At that point in the trial, the burden then shifted to the University to show that the same decision with respect to Dr. Hillis' renewal would have been made had the Kelly Perkins controversy never occurred. As Justice Rehnquist described the employer's burden in *Mt. Healthy*:

. . . the District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct.

*Mt. Healthy, supra,* 287, 97 S.Ct. 576. The University failed to meet its burden. The only evidence introduced with respect to Dr. Hillis' conduct other than incidents which followed the Perkins directive concerned Dr. Hillis' acquisition of a light bulb. Contrary to University regulations and procedures, Dr. Hillis had obtained a light bulb needed for classroom use in the business district rather than through the central store of the University. The incident and Dr. Delaney's description of it would not justify the conclusion that non-renewal would have occurred as a result of this transgression.

The University's other position with respect to Dr. Hillis' non-renewal was that it was based on disruption of the academic community. Admitting pursuant to *Pickering, supra,* that its position was content related, the University argued that the

---

4. Dr. Delaney testified that he had made the decision regarding non-renewal in December, 1974. This testimony is generally not worthy of belief insofar as it is uncorroborated and may be the product of fabrication. Dr. Delaney, if he had made the decision at that time, would likely have advised Dr. Hillis so that on

his Washington, D. C. trip he could have entered the interview process for other employment. The art conference Dr. Hillis attended also functioned as a job market. In any case, relying solely upon Dr. Delaney's other testimony, the decision if it was made in December was predicated on the Perkins problem.

manner of Dr. Hillis' speech was so "abrasive and disruptive" that the University's interest in curtailing it by his non-renewal was justified. While the public interest and public forum aspects of *Pickering* seem to be in question after *Givhan*, the balancing test would seem to be available as an alternate defense. The Fifth Circuit has considered possible disruptive effect of protected activity in the employment context.[5] In evaluating a disruptive effect defense, the Fifth Circuit has held:

> . . . In considering First Amendment rights the court is always required to look at the place, time, and circumstances involved in striking the necessary delicate balance between the interests of the government and the constitutional rights of the individual . . . We clearly recognized that in order to justify the slightest interference with First Amendment rights there must be a showing that the exercise of such rights 'materially and substantially' interfered with the duties required to be performed by an employee.
>
> *Abbott v. Thetford*, 534 F.2d 1101 (*en banc*), *reversing and adopting dissenting opinion*, quoted here 529 F.2d 695, at 706–707 (5th Cir. 1976).

There is no evidence that Dr. Hillis' speech with regard to the Kelly Perkins incident materially and substantially interfered with his teaching obligations. Likewise, his appeal to the AAUP regarding his reassignment and grade change were not *per se* disruptive of his teaching.

Dr. Hillis' protected activity could be construed as being disruptive only to Dr. Delaney. Were the Court dealing with a situation which required a close, personal and confidential relationship as the Fifth Circuit faced in *Abbott, supra*, the Court might reach a different result. Giving due regard to the time, place and manner of the protected activities, the fact that Dr. Hillis'

conduct occurred in an academic environment has not escaped the Court's attention. This is not the sensitive situation presented by a Veteran's Hospital or a Judge's Chambers, nor are the working relationships analogous. *Smith*, note 5; *Abbott, supra*. There is no evidence to conclude, and common experience supports the converse, that a Department Chair and an Associate Professor must enjoy a close, personal or confidential relationship. In accordance with *Abbott*, the Court concludes that Dr. Hillis' protected activities did not materially or substantially interfere with his duties as a college professor.

Therefore, the Court concludes that the non-renewal of Plaintiff's contract was substantially motivated by the lawful exercise of protected First Amendment activity. *Mt. Healthy, supra*. The University failed to show by a preponderance of the evidence that the non-renewal would have occurred absent the exercise of protected activity. *Mt. Healthy, supra*. Further, Dr. Hillis' exercise of protected activities did not materially or substantially impede his performance as a professor. *Abbott, supra*.

### III.

#### The Remedy

Questions regarding remedial relief frequently turn on the appropriateness of a particular remedy for the harm suffered. Rather than focusing on a choice of remedies, the Court is put to the question of whether it possesses the power to grant full relief. Specifically, the Court is called upon to decide whether monetary damages in the nature of a back pay award are recoverable against Stephen F. Austin State University in light of the Eleventh Amendment.

The language of the provision itself is the starting point for the Court's analysis of the remedy question:

---

5. Notably, *Smith v. United States*, 502 F.2d 512 (5th Cir. 1974) dealt with the disruptive effect of the practice of wearing a peace emblem by a staff psychologist at a V. A. Hospital whose patients were Viet Nam veterans at the height of the anti-war movement. *Abbott v. Thetford*,

534 F.2d 1101 (en banc), rev'g and adopting dissenting opinion 529 F.2d 695 (5th Cir. 1976); *Ayers v. Western Line Consolidated Independent School District*, 555 F.2d 1309 (5th Cir. 1977), *rev'd, Givhan, supra*.

The Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State or by Citizens or Subjects of any Foreign State. U.S.Const. amend. XI.

Any consideration of an Eleventh Amendment immunity question would be incomplete without the historical footnote to *Chisholm v. Georgia*, 2 Dall. 419, 1 L.Ed. 440 (1793). *Chisholm* was a suit in assumpsit against the State of Georgia by two citizens of South Carolina. By ruling that the original jurisdiction of the Supreme Court extended to such a suit, public opinion with regard to sovereignty of the states was ignited. The Eleventh Amendment was ratified in response to the perceived invasion of the Supreme Court into the affairs of the coordinate sovereigns. As a result of the amendment, nuances of traditional sovereign immunity have gained constitutional protection. Not only is the Eleventh Amendment applicable to suits in the federal courts in which the State is named as a party, the Amendment has been extended to immunize arms or instrumentalities of a state. *Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945).

■ Contemporary Eleventh Amendment jurisprudence was born with *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). A class action in equity, the Plaintiffs sought relief from Illinois officials who administered a partially federal funded welfare program called the Aid to the Aged, Blind, and Disabled. The Illinois program qualifications were at variance with the federal guidelines. As a consequence of the variance, a class of persons who were qualified for benefits under the federal plan were excluded by the more stringent Illinois guidelines. Class relief ordered by the district court in *Edelman* was of two types: 1) declaratory relief that the class was entitled to prospective benefits, and 2) an equitable award of back benefits to each adversely affected class member. It was the retroactive award of back benefits which was reversed by a divided Supreme Court. In reaching the issue of whether retroactive benefits were barred as a form of relief by the Eleventh Amendment, the majority satisfied the initial inquiry that the suit was essentially one against the State of Illinois:

> These funds [retroactive benefits] will obviously not be paid out of the pocket of the petitioner Edelman . . . The funds to satisfy the award in this case must inevitably come from the general revenues of the State of Illinois, and thus the award resembles far more closely [a] monetary award against the State itself
>
> . . .
>
> *Edelman, supra*, 664–665, 94 S.Ct. 1356–1357. (Citations Omitted)

Therefore, the question of damages immunity depends, at least in part, upon the source of revenue from which the award is to be paid.[6]

Three terms later an unanimous Supreme Court again had occasion to deal with a determination of whether a public institution and its officers were an arm of the State for Eleventh Amendment purposes. *Mt. Healthy v. Doyle, supra*. The lower court had ruled that the school district had waived its Eleventh Amendment immunity, but Justice Rehnquist, again writing for the

---

6. The Court recognizes that *Edelman v. Jordan* as been supplemented by its sequel *Quern v. Jordan*, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 1139 (1979). *Quern* dealt with the question of abrogation of Eleventh Amendment immunity through congressional enactment of 42 U.S.C. § 1983. Abrogation of immunity was found to be present in Title VII adoption in *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). The *Quern* decision failed to find that § 1983 abrogated Eleventh Amendment immunity. However, its holding is at least subject to question based upon the limited issue before the Court; i. e., the appropriateness of the injunctive decree. For the purposes of this case, *Quern* need not be contended with since it is chiefly a waiver/abrogation case. The fundamental question of the nature of the entity requires the Court's attention to determine if the University is the State for the purposes of the Eleventh Amendment. Since the question is resolved against immunity, waiver does not become an issue for the Court.

court on the immunity question, determined that the school district was the state for Eleventh Amendment purposes. To paraphrase Justice Rehnquist, it became a question of whether the district was "more like" the state or "more like" a political subdivision. *Mt. Healthy*, 429 U.S. 280, 97 S.Ct. 572. In answer to the question, the Court looked to Ohio state law in order to determine the nature of the entity. Factors looked to and relied upon in the determination may be listed as follows:

1. The extent of funding received from the state. The school district was found to have received "a significant amount." *Mt. Healthy*, 280, 97 S.Ct. 572.

2. The extent of state control exerted over the district. The district was found to have received "some guidance" from the Ohio State Board of Education. *Id.*, 280, 97 S.Ct. 572.

3. Power to generate own revenue. Ohio school districts were empowered to issue bonds and levy taxes. *Id.*, 280, 97 S.Ct. 572.

4. The applicable state definition of political subdivision. School districts were defined to be political subdivisions under Ohio law. *Id.*, 280, 97 S.Ct. 572.

*Mt. Healthy* and *Edelman* both noted that the nature of the inquiry and the factors considered would vary with the institution under consideration.

In answering the question of whether Stephen F. Austin may be shielded from damages by virtue of the Eleventh Amendment, the Court is unable to look to a precise holding of the Fifth Circuit on the issue. The Fifth Circuit has twice determined that junior colleges in the State of Texas may not cloak themselves with Eleventh Amendment immunity. *Goss v. San Jacinto Junior College*, 588 F.2d 96, *modi-*

*fied on other grounds*, 595 F.2d 1119 (5th Cir. 1979); *Hander v. San Jacinto Junior College*, 519 F.2d 273, *aff'd per curiam on rehearing*, 522 F.2d 204 (5th Cir. 1975). The Court also notes that a recent panel decision, *Gay Student Services v. Texas A & M University*, 612 F.2d 160 (5th Cir. 1980), may indicate the ultimate decision of the circuit with regard to state senior colleges. The decision implies approval of a finding that Texas Tech University was immune from a damage award. *Henry v. Texas Tech University*, 466 F.Supp. 141 (N.D.Tex. 1979). However, in the absence of a precise holding on the issue, the Court must follow the formula for evaluation of the question as set forth by the Fifth Circuit. *Gay Student Services* instructs the Court to look to the nature of the entity to first determine whether it is an arm of the state or an independent political subdivision. If the University is an arm of the state, the Eleventh Amendment will bar a monetary award if such an award will be paid out of the state treasury. The evaluation of the institution based upon the nature of the entity may be referred to as a structural analysis.

In order to perform the prescribed structural analysis, the Court has looked to the statutory scheme and the relevant testimony adduced at trial.[7] In this regard, the Court has also looked with some emphasis to the Fifth Circuit's structural analysis of the San Jacinto Junior College. *Hander, supra; Goss, supra.* By comparing the two institutions, a clear picture of their similarities and differences develops.

Both Stephen F. Austin University and San Jacinto Junior College receive biennial appropriations from the state. Tex.Ed. Code § 61.059. The Coordinating Board controls and supervises to a limited degree certain aspects of both institutions. Tex. Ed.Code § 61.001 *et seq.* The Attorney

---

7. My distinguished brother, the Honorable William Wayne Justice, has reached the same decision with respect to the Eleventh Amendment immunity of Stephen F. Austin. Holding the University not an alter-ego of the State for the purpose of the Eleventh Amendment, Judge Justice did not have the benefit of the extent of the immunity testimony which the University brought in this case. Despite the University's failure to offer the same proof on the immunity issue in both cases, our holdings in this regard will be uniform. *Somberg v. Walker*, TY–75–325–CA (E.D.Tex. July 6, 1979). (unreported).

General of the State of Texas represents Stephen F. Austin State University and San Jacinto Junior College. Each institution is permitted to control locally generated funds from ten sources pursuant to Tex.Ed.Code § 51.002.

Some characteristics of San Jacinto Junior College as distinguished from Stephen F. Austin State University would seem to mitigate toward greater control of the junior college by the state. Notably, the junior colleges are controlled not only by the Coordinating Board, but they are also subject to a degree of supervision by the Central Education Agency. Junior College boards of regents are granted only such powers not vested in the Coordinating Board or the Central Education Agency. Tex.Ed.Code § 130.002. Additionally, the revenue bonding authority of junior colleges is not as extensive as the bonding authority of the senior colleges. Tex.Ed.Code § 55.18, 53.01 *et seq.*

These factors which favor a finding of immunity are counterbalanced by four factors. First, junior colleges are created by local initiative. Tex.Ed.Code § 130.031. Their governing bodies are elected by district vote rather than appointed by the Governor of the State of Texas. Tex.Ed.Code § 130.003(e). Most significant for immunity purposes is the fact that junior colleges have the power to levy ad valorem taxes. Tex.Ed.Code § 130.122. If the Court were restricted to these facts alone, a finding of immunity would follow.

■ However, Stephen F. Austin State University is possessed of certain characteristics which would encourage a finding of no immunity. The bonding authority of the University and other state senior colleges is more extensive than is the bonding authority of the junior colleges. Tex.Ed.Code §§ 53.01 & 55.18. Further, the bonding provision makes it clear that revenue bonds issued pursuant to the section are not general obligations of the State of Texas. *Id., supra.* Although the Board of Regents is appointed by the chief executive officer of the state, its power to act as the administrative body of the University is more extensive. Powers specifically enumerated through §§ 95.21 and 101.41 include the power to acquire property in the name of the University and the power to make employment decisions irrespective of the state public employment scheme. With regard to locally generated revenue, the University and San Jacinto Junior College are granted the same powers of control. Tex.Ed.Code § 51 A. The importance of local revenue is underscored when the fact that the University generates approximately fifty percent of its own budget is considered.[8]

. A finding of damages immunity for Stephen F. Austin State University will expand the Eleventh Amendment bar to the jurisdiction of the federal courts beyond its previously drawn parameters. *Edelman v. Jordan,* a suit against the Illinois state welfare department, was essentially a suit against the executive branch of the State of Illinois. *Ford Motor Co. v. Department of the Treasury* was a suit on a liability against the treasury of a state, again a part of the executive branch of a state government. In *Mt. Healthy v. Doyle,* the Supreme Court had an opportunity to expand the scope of the Eleventh Amendment. The Court was reluctant to extend the bar to a recovery of damages against an entity which clearly did not fall within the execu-

---

8. A review of Dr. Haas' testimony is telling on the issue:

Q: . . . if you had a surplus in your locally generated funds, that's Stephen F. Austin's surplus, isn't it?
A: Yes, sir.
Q: Kept separate and apart from general funds received in the Treasury and no other college and no other Government entity can claim that money, can they?
A: That's correct.

\* \* \* \* \* \*

Q: Now, is it true that these locally collected funds of a total of 18 million plus is in fact earmarked or tagged when it goes [to the State Treasury]—so that they are Stephen F. Austin funds, but it's just held by the State.
A: That's correct.

The testimony and Plaintiff's Exhibit 63–A establish that the amount of locally generated funds in the exclusive control of the university for the fiscal year ending July, 1979, was $18,-451,320.17.

tive, legislative or judicial branch of a state government. This Court possesses the same reluctance.

■ The vindication of individual rights against governmental infringement may be the highest calling of the federal courts. The court is aware, and has not discounted the fact, that the Fourteenth Amendment has been rejected as a repealer of the Eleventh Amendment. *Jagnandan v. Giles*, 538 F.2d 1166 (5th Cir. 1976). The policy analysis the Court now engages in is not predicated on a view that the First and Fourteenth Amendments contravene the Eleventh Amendment. The Court is rather of the opinion that an expansion of Eleventh Amendment at the peril of meaningful redress of individual rights should not go without some reflection. The balancing of competing interests is common in the attempt to resolve conflicts between constitutional provisions. *Nebraska Press Association v. Stuart*, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); *Gannett Co. v. DePasquale*, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979). In a case in which the defendant is not a branch *per se* of the state government and the structural analysis is close, the vindication of constitutional rights demands that the Court refrain from expanding the Eleventh Amendment beyond its previously defined scope.[9]

A further restriction on the Court's remedial powers contradicts the common law maxim, "For every right, there is a remedy." The fundamental precept of remedial relief as it relates to our Constitutional system of government was addressed by Chief Justice Marshall:

> The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws whenever he receives an injury. One of the first duties of government is to afford that protection . . . The government of the United States has been emphatically termed a government of laws and not of men. It will certainly

cease to deserve this high appellation, if the laws furnish no remedy for violation of a vested legal right.

*Marbury v. Madison*, 5 U.S. 137, 163, 2 L.Ed. 60 (1803).

The question is no less dramatic when the choice is between a partial remedy and complete relief. A remedy for a vested legal right must be a full remedy; it must not rectify only a part of the loss.

Reinstatement would be a partial remedy. In the nature of injunctive relief, reinstatement would not be precluded by the Eleventh Amendment even if the Court were to find Stephen F. Austin State University an arm of the state for immunity purposes. *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *Gay Student Services, supra*. In the absence of direct authority to the contrary and in recognition of the hybrid character of the institution in question, the Court reads the Eleventh Amendment narrowly in light of the articulated policy concerns.

The Court does not mean to suggest that the policy analysis it has engaged in would be appropriate in any Eleventh Amendment immunity question. The balancing of interests should only be engaged in when the traditional structural analysis fails to yield a clear result. In matters of constitutional law which have extreme ramifications both to our public institutions and to individual rights, this Court will endeavor to assess the implications of its actions.

■ Therefore, the Court holds that Stephen F. Austin State University is not subject to Eleventh Amendment damages immunity. *Edelman v. Jordan, supra*. By a separate order contemporaneously entered with this memorandum opinion, back pay in the amount of $68,845.57 is awarded to Richard K. Hillis. Dr. Creighton Delaney is the only named individual defendant for whom good faith immunity is not available as a defense. *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975).

---

9. The Court notes that the Fifth Circuit refrained from expanding the Eleventh Amendment in both *Hander, supra*; and *Goss, supra*.

Therefore, the back pay award is a joint and several liability against the University and Dr. Delaney. Reinstatement is ordered. The question of attorney's fees having been severed from the merits, an appropriate motion and affidavits are now timely and will be considered by the Court.