Petra RAMOS, Plaintiff,

v.

TEXAS TECH UNIVERSITY, the Board of Regents of Texas Tech University (J. Fred Bucy, Jr., Bill E. Collins, Clint Formby, Dr. John Hinchey, A. J. Kemp, Jr., Robert L. P. Pfluger, Charles G. Scruggs, Dr. Judson F. Williams, Don R. Workman, Individually, jointly and severally), Grovery E. Murray, President, Texas Tech University, J. Knox Jones, Jr., Dean of the Graduate School, Thomas A. Langford, Associate Dean; Robert Bell, Chairman of the Department of Psychology, G. Frank Lawlis, former professor, John S. Gillis, Associate Professor, Individually, jointly and severally, Defendants.

Civ. A. No. CA–5–75–77.

United States District Court,
N. D. Texas,
Lubbock Division.

April 14, 1977.

David T. Lopez, David T. Lopez & Associates, Houston, Tex., for plaintiff.

James H. Milam, Crenshaw, Dupree & Milam, Lubbock, Tex., Scott Garrison, Asst. Atty. Gen., John L. Hill, Atty. Gen. of the State of Texas, Austin, Tex., for defendants.

## MEMORANDUM

WOODWARD, Chief Judge.

On the 10th day of March, 1977, there appeared in open court each of the above parties by and through their attorneys of record, and the court has heard and considered the evidence from the parties. After the close of all evidence, the court has taken under consideration all of the exhibits, the pleadings, and the briefs and arguments of counsel and files this memorandum which shall constitute the court's findings of fact and conclusions of law.

Petra Ramos, a female Mexican-American, has filed her complaint in this court claiming jurisdiction of her 42 U.S.C. §§ 1981, 1982, and 1983 causes of action under the provisions of 28 U.S.C. § 1343. The defendants constitute the Board of Regents of Texas Tech University, its President, Dean and Associate Dean of the Graduate School, the Chairman of the Department of Psychology, a former professor in the Department of Psychology, an associate professor of the Department of Psychology, each individually and as Regents, officers, and professors of Texas Tech University. Texas Tech University is also a party defendant.

Petra Ramos is a 1962 graduate of Tulia High School and entered the School of Arts and Sciences of Texas Tech University in the fall of that year. It was not until 11 years later, on August 25, 1973, that she received a degree of Bachelor of Arts, with a major in Spanish. Her grade point average (G.P.A.) for all of her courses during this period of time was 1.44 on a 4-point system. Her G.P.A. for her last 60 hours of work was higher (1.91) than her overall average at the time of graduation. (Pltf's Ex. 1).

In the spring of 1973, the plaintiff was given permission to take courses in the Graduate School of Texas Tech University but she was not at that time accepted into the Master's degree program which she was seeking. It was her intent and desire to secure a Master's in Rehabilitation Counseling. Plaintiff's Exhibit 3 shows that she was only tentatively awarded a position in such Masters program and it was conditional.

Pursuant to the permission given her to take courses in the Graduate School, Petra Ramos enrolled in 12 hours in the fall of 1973, getting a B in 9 of those hours and withdrawing from 3 hours. In the spring of 1974, she enrolled in 9 hours, securing an A in 3 hours, a failing grade in 3 hours, and the record indicates that she was subsequently given a B in another 3 hours. In the summer of 1974, she was given an A in 4 hours and a B in 3 hours. Her G.P.A. for

this work in the Graduate School during the 1973–74 academic year and the summer sessions of 1974 was just under 3.0, while the average G.P.A. of other graduate students was 3.5 or 3.6.

As is required, the plaintiff took the G.R.E. test. Her score was 580 the first time she took the test and 610 the second time. The evidence indicates that of those seeking admission to the various Master's degree programs in the Graduate School of Texas Tech University, the average G.R.E. was 1200. Out of approximately 100 applicants for admission to the Masters Program the plaintiff's G.R.E. and G.P.A. scores placed her in the bottom 5%.

In view of this extremely low academic record, the plaintiff was advised by the Assistant Dean of the Graduate School on January 15, 1974 (Pltf's Ex. 4) that her scores were at a level below that which was required for admission to the degree program in that Graduate School. Later, on May 31, 1974 (Pltf's Ex. 5), the Associate Dean reconfirmed this rejection of her application after she had taken the second G.R.E. test.

In July of 1975, the complaint in this case was filed by the plaintiff alleging that her rights under the First, Fifth, Thirteenth, and Fourteenth Amendments had been violated by the actions of the defendants in denying her admission to the Master's degree program, and seeking damages pursuant to the Civil Rights Acts, 42 U.S.C. §§ 1981, 1982, and 1983.

The evidence in this case discloses that the defendants took unusual steps and showed a great deal of concern in an attempt to assist the plaintiff with her academic difficulties. When she complained of the F that she received in Psychology 532 in the spring of 1974, a qualified professor in this subject from the University of Denver was given a copy of her final examination paper and her final written theme in the course for re-grading without any indication of what she had received in the course from the professor at Texas Tech University. This professor from Denver testified that he re-graded the papers and that they

were totally unacceptable and could not be given a passing grade. Further, various professors in the department counseled on many, many occasions with the plaintiff, seeking to guide and assist her, but these efforts were not successful. In spite of their concern and interest for the plaintiff as an individual, they were unable to and did not recommend to the Vice President of the University for the Graduate School that she be admitted in the Master's degree program.

As to the First Amendment rights that plaintiff claims were violated, the evidence indicates that Texas Tech University had employed a Mr. Boucher to act as a liaison between the University's administration and the Chicano students to assist them in any problems that they might have. A seminar had been scheduled to discuss problems of minority students and the program showed that no persons of the Mexican-American descent were listed among the speakers. Several of the students, including the plaintiff, threatened a boycott of this seminar and, without any further incident, it was canceled. The plaintiff had also been engaged in other student activities, including the Raza Unida Party, and one or two other similar organizations. Absolutely no violations or interruptions of the affairs of the University resulted from any of her activities. However, on one occasion, Mr. Boucher told the plaintiff that some people in the Psychology Department considered her as an activist and as a troublemaker. No names or other identification as to the persons who had this opinion of the plaintiff were given.

■ The evidence, on the other hand, conclusively shows that the Vice President in charge of the Graduate School, the Dean, and the plaintiff's professors, did not take this into consideration in any manner in evaluating her performance and eligibility to become a candidate for a Master's degree in Rehabilitation Counseling. The Vice President, Mr. Jones, who makes the final decision in these matters, testified that he knew nothing of these activities until after she had been turned down as a candidate

for a Master's degree. One of her professors, Dr. Lawlis, who was in charge of this particular program, testified that he had never heard of these matters until it was brought out during the trial of this case. While it may be true that the plaintiff did engage in these activities, and that she also had the right to exercise her First Amendment rights in this respect, the evidence simply does not show in any degree that this influenced or resulted in the rejection of her application to the Masters program.

■ Plaintiff is Mexican-American, and the court recognizes that tests and examinations can be so framed and designed that the examinations themselves can result in a futile and perhaps unrecognized form of discrimination against minorities. Because of a cultural background or the lack of equal educational training in the public schools and undergraduate work, the very nature and subject matter of the examinations can act to the detriment of a minority. *See, e. g., Griggs v. Duke Power Company,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). In such cases, the courts can give some form of relief even though the resulting discrimination was not intentional or consciously done. If the evidence in this case were to show that the examinations given by Texas Tech University to the plaintiff in her courses or if the questions and subject matter of the G.R.E. tests were not fair to those minorities who might take such examinations and tests, the court could fashion the appropriate relief.

But such is not shown by the evidence in this case. It should be borne in mind that the plaintiff ranked in the low 5% as to grades of those seeking admission, and that in spite of counseling efforts and the efforts of those concerned with her education, she still could not obtain grades that would be satisfactory for admission to the Master's degree program in question.

■ It seems that the plaintiff is basing her complaint on the fact that she is, first, a Mexican-American, and, second, that she was denied admission to the Master's degree program, and, therefore, she is entitled to relief without any further showing of

facts indicating discrimination toward her or to the Mexican-Americans as a class. The only evidence was that plaintiff was the only Mexican-American in 1973–74 in the program and no Mexican-American was in the program in 1974–75. Not only are these bare statistics meager, but also absent a showing of discrimination, the court cannot afford relief. *See, Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

Plaintiff also seeks relief for an alleged violation of Procedural Due Process. That is, plaintiff argues that by not allowing plaintiff to be admitted into the degree program, plaintiff was deprived of her "liberty" or "property" interests without due process. Plaintiff's liberty interest is said to arise from "Plaintiff's being judged not on her academic performance, but upon the Defendants' subjective evaluation of her lack of ability." (Pltf's Post-Trial Brief, p. 13). However worded, the thrust of the argument is that a "stigma" was placed on plaintiff's reputation by letters written to plaintiff and placed in her permanent file:

". . . Your grades for the spring semester are such as to confirm our feeling that the likelihood of your successful completion of a graduate program is certainly doubtful. . . ." Letter dated May 31, 1974 from Dr. Thomas A. Langford, Associate Dean. (Pltf's Ex. 5).

"The consensus was that your performance was extremely poor on a consistent level and some of the instructors felt that the grade given was a result of their efforts in giving you individual attention to the detriment of the other students. Nevertheless, your grades are evidence that your abilities are possibly in another area. . . ."

Letter dated August 14, 1974 from G. Frank Lawlis, Director of Rehabilitation Counseling. (Defts' Ex. 6).

■ The law in this area presents serious problems for plaintiff's claim. While *Greenhill v. Bailey*, 519 F.2d 5 (8th Cir. 1975), tends to support plaintiff's position, the Supreme Court's later determination of liberty interests in *Paul v. Davis*, 424 U.S.

693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), seriously undermines plaintiff's argument. In *Davis*, the Court noted that it was not established that "reputation alone, apart from some more tangible interests such as employment, is either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process clause." 424 U.S. at 701, 96 S.Ct. at 1161. *Davis* distinguished *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), on which plaintiff relies, by noting that there "Ohio law conferred a right upon all children to attend school, and that the act of the school officials suspending the student there involved resulted in a denial or deprivation of that right." 424 U.S. at 710, 96 S.Ct. at 1165. Graduate students in Texas schools, however, enjoy no right to be admitted to graduate programs. Prior to admission, then, it could be said that they have only a "unilateral expectation" of admittance. As plaintiff is thus not being terminated from employment or deprived of a right to public education, it could be said that no liberty interest arises.

■ Even assuming *Davis* does not control here, the plaintiff has failed to show that her reputation was damaged. Unlike *Bailey, supra*, defendants have not conceded that plaintiff is foreclosed from attending graduate schools in other parts of the country. Also, plaintiff has not shown that the above-cited letters have in fact prevented her from enrolling in other schools. On the record before this court, then, no deprivation of plaintiff's liberty interest has occurred.

■ Plaintiff also claims deprivation of her right to "property" without due process. To have a property interest one must:

"have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it."

*Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548. *Roth* further noted that:

"Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . ."

408 U.S. at 577, 92 S.Ct. at 2709.

■ The facts of this case do not support plaintiff's "property" claim. On March 6, 1971 plaintiff was informed that she had been granted:

"Provisional admission to the Graduate School. *This is not admission to a degree program*, but a temporary classification made pending your admission to a degree program by the Dean of the Graduate School, acting upon the recommendation of the proposed major department." (Pltf's Ex. 2). (emphasis in original).

Plaintiff was further informed on April 19, 1973 that she had:

"been tentatively awarded a position in our M.A. Level Rehabilitation Counselor Training Program for the academic year 1973–74. The final approval is dependent upon the acceptance of your application to the Graduate School of the Dean of Admissions and the Dean of the Graduate School." (Pltf's Ex. 3).

Plaintiff was then notified in a series of four letters from January 15, 1974 to August 14, 1974 that her grades and G.R.E. scores prevented her admission into the graduate degree program. (Pltf's Exs. 4 and 5, Defts' Exs. 1 and 6). These facts clearly reveal that plaintiff was never accepted into the program. Not having been accepted, plaintiff's "unilateral expectation" of admission does not rise to the level of a "legitimate claim of entitlement"; plaintiff has no interest in "property" upon these facts.

■ It is a further finding of the court that the evidence in this case fails to show that any of the individual defendants, either in their individual or official capacity, acted in an arbitrary, capricious, or malicious manner. On the other hand, the evidence establishes to the satisfaction of this court that the actions of those individuals who were concerned with this problem were in good faith and with an honest and sincere effort to give the plaintiff every opportunity to establish the proper credentials for entry into this degree program. Of course, there is no evidence that any member of the Board of Regents had any knowledge, sanctioned any act, or authorized any other individual to take any action with respect to the plaintiff, and there is no evidence to support any judgment awarding relief against these individuals. Instead of indicating any discriminatory act or attitude toward the plaintiff, the evidence in this case convinces the court that the individual professors, deans, and officers of the University who had knowledge of the problem went out of their way to assist plaintiff. One of her professors was so concerned and interested that the record indicates it became a matter of personal concern with him, but in spite of this, her academic record could not in any way justify her admission to the degree program.

■ As the evidence does not prove or in any way show a violation of plaintiff's rights under any of the constitutional amendments which she alleges, the court can award no relief against any of the defendants. However, in making this decision, it should not be construed as a ruling or a decision that this court can give any monetary damage or relief against Texas Tech University as the court is of the opinion that this relief would be barred by the Eleventh Amendment in this case. Although prospective injunctive relief could be awarded in the proper case, *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), the facts cannot support such relief here. Of course, relief can be given in the proper case against individuals under 42 U.S.C. § 1983, 28 U.S.C. § 1343, but again, the plaintiff has failed to establish any cause of action under the evidence in this case. Therefore, it is not necessary that the court make any conclusions with respect to the qualified immunity claimed by the individuals.

All costs will be taxed against the plaintiff.

A judgment will be entered accordingly.