UNITED CAROLINA BANK, Administrator CTA of the Estate of Seymour I. Somberg, Deceased, Plaintiff-Appellee,

v.

BOARD OF REGENTS OF STEPHEN F. AUSTIN STATE UNIVERSITY, et al., Defendants-Appellants.

No. 80–1624.

United States Court of Appeals, Fifth Circuit.* Unit A

Jan. 11, 1982.

L. Gregory Wilson, Asst. Atty. Gen., Richard E. Gray, III, Executive Asst. Atty. Gen., Austin, Tex., for defendants-appellants.

Rorie & Pedersen, Tom D. Rorie, Nacogdoches, Tex., for plaintiff-appellee.

Before CHARLES CLARK, TATE and SAM D. JOHNSON, Circuit Judges.

CHARLES CLARK, Circuit Judge:

The Board of Regents of Stephen F. Austin State University (SFA), its president, Dr. William R. Johnson in his official capacity, and four members of the university administration who were sued individually in this section 1983 action appeal from a judgment entered for the plaintiff, Dr. Seymour Somberg. The action was based on the university's denial of tenure to Somberg and his loss of the position of professor in the School of Forestry. After a bench trial the court determined that Somberg's first and fourteenth amendment rights had been violated, that his contract had been breached and that he had established liability under an implied cause of action under the Texas Penal Code. The court awarded Somberg tenure, reinstatement, backpay and other compensation of $144,161.99, attorney's fees of $34,338.00 and costs of $3,570.00. Judgment was entered jointly and severally against the Board of Regents and the President of the University in their official capacities, and the other four defendants, Dr. Laurence C. Walker, Dean of the School of Forestry at SFA; Dr. John T. Lewis, III, Vice-President for Academic Affairs; Dr. Ralph Steen, President of the University during Somberg's tenure; and Dr. J. David Lenhart, Assistant to the School of Forestry, in their individual capacities. Dr. Somberg died during the pendency of this action, and the administrator of his estate is now the plaintiff of record.

We affirm the district court's holding that Somberg's termination violated his first amendment rights, and we affirm the award of attorney's fees against the Board, President Johnson and the individual defendants. We reverse the backpay award against the Board of Regents and President Johnson which is barred by the eleventh amendment and reverse the claim allowed, based on an implied cause of action under the Texas Penal Code.

## FACTS

On April 17, 1970 Somberg was offered employment at SFA as Professor and Director of Research in the School of Forestry. Somberg's initial 1970–71 contract was for a nine month period, and he was reappointed for the 1971–72 school year by means of another nine month contract. During this second year, the tenure policy which existed when he entered service was amended by the Faculty Senate. Somberg was reappointed for the 1972–73 year by means of another nine month contract. During this third year a moratorium on the granting of tenure was enacted by the Dean's Council. The effect of these changes in the tenure situation are discussed below.

Somberg's fourth year appointment, received on April 9, 1973, did not specify that his probationary status was being extended. However, on April 25, 1973 Somberg was informed by letter that he would not receive tenure at that time. Somberg's protests about this denial of tenure culminated in a hearing before the Faculty Senate which voted that he did not have tenure. Although the administration had announced

beforehand its intention to abide the outcome of the vote, Somberg had declared he would not necessarily be bound. On February 7, 1974 during his fourth year, Somberg was told that his next year would be his last at SFA.

Somberg's duties as Director of Research included bookkeeping for research funding provided by state sources and the federally funded McIntire-Stennis Forestry Research Program. Soon after his arrival at SFA, Somberg began making allegations concerning the misuse, or misallocation of research funds. These claims were founded primarily on Somberg's calculations as to the percentage of time certain professors were devoting to research and the percentage spent on teaching. He compared this ratio of research to teaching with the share of their compensation derived from research funds. This comparison disclosed to him that certain professors were receiving more than their proportionate share of research funds based on the percentage of time they spent doing research. Somberg made other allegations such as the use of research funds to finance transportation which was not for research purposes. He repeated these allegations frequently during the time he was employed at SFA.

After the April, 1973 notice that he would not receive tenure, Somberg met with Walker to discuss a plan whereby Somberg would resign as Director of Research to become the Director of International Studies in the School of Forestry, a new post which was to be created for him. During the course of his employment a serious personality conflict developed between Somberg and Walker, which was due in part to Somberg's repeated allegations concerning the misuse of research funds. This conflict manifested itself in a variety of ways, including a misunderstanding between the two men concerning the duties Somberg would perform in his new role as Director of International Studies. Somberg prepared a memorandum of understanding in which he attempted to set out the agreement reached with Walker. For example, it provided he would teach no more than two courses each semester, and none in the

summer. Walker refused to sign the memorandum. During the 1973–74 school year Somberg assumed the post of Director of International Studies and thereafter had little contact with Walker. He apparently continued to speak out concerning research funds. This prompted Walker to caution him that unless he ceased talking to people outside the University he would lose his job.

On February 7, 1974 Somberg was told by Walker that since he had resigned as Director of Research his 1974–75 contract would be a terminal one. From this point, until the time in the fall of 1974 when Somberg resigned from the University, Somberg not only continued to pursue his protests over the tenure issue, but also escalated the intensity and scope of his criticisms concerning the misallocation of research funds at SFA. So too, the defendants escalated their reprisals to his criticisms by cancelling his travel funds, excluding him from general pay increases, changing his responsibilities to 100% teaching, and cutting off help from graduate assistants. Because these reprisals made his working conditions unreasonable, Somberg resigned his post at SFA.

The escalation of hostilities occurring after February 7, 1974 forms no basis for our decision, since these events obviously have no bearing on the reasons for Somberg's termination on that date. Neither do we characterize any party's conduct during that period. Likewise, a dispute concerning Somberg's absence from classes in the fall of 1974 due to eye surgery is irrelevant. Finally, we note that an audit of the McIntire-Stennis program, conducted after Somberg resigned, corroborated his allegations, although the parties disagree as to the extent of such corroboration.

*Eleventh Amendment Immunity*

 We are confronted at the outset with the question of whether the eleventh amendment bars federal jurisdiction over Somberg's claims against the Board of Regents and President Johnson, in their official capacity. Although the language of

the eleventh amendment indicates that a state must be sued before the bar to suit in federal court applies, it is not necessary for the state to be actually named in the suit if by suing a state official the action is in effect one against the state and any recovery will come from the state. *Edelman v. Jordan*, 415 U.S. 651, 663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974); *Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 462, 65 S.Ct. 347, 349, 89 L.Ed. 389 (1945); *Jagnandan v. Giles*, 538 F.2d 1166, 1173 (5th Cir. 1976). We must decide whether the Board of Regents of SFA is to be treated as an arm of the State partaking of the State's eleventh amendment immunity, or is instead to be treated as a municipal corporation or other political subdivision to which the eleventh amendment does not extend. *Edelman v. Jordan*, 415 U.S. at 667 n.12, 94 S.Ct. at 1358 n.12; *Mt. Healthy City School District v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977); *Hander v. San Jacinto Junior College*, 519 F.2d 273, 278 (5th Cir. 1975); *Gay Student Services v. Texas Ass'n*, 612 F.2d 160, 165 (5th Cir. 1980). In answering this question we examine the powers, characteristics and relationships created by state law in order to determine whether the suit is in reality one against the state. *Mt. Healthy*, 429 U.S. at 280, 97 S.Ct. at 572; *Hander*, 519 F.2d at 279.

The majority of decisions concerning the eleventh amendment status of state universities have concluded the institutions involved were arms of the state. Yet, each situation must be addressed individually because the states have adopted different schemes, both intra and interstate, in constituting their institutions of higher learning. *See e. g., Vaughn v. Regents of Univ. of Calif.*, 504 F.Supp. 1349, 1352 (E.D.Cal. 1981).

Until *Hillis v. Stephen F. Austin State University*, 486 F.Supp. 663 (E.D.Tex.1980) and the decision below found that Stephen F. Austin is not an arm of the state for eleventh amendment purposes, federal district courts sitting in Texas had consistently reached the conclusion that universities classified as "general academic teaching institutions" or "public senior colleges or universities," Tex.Educ.Code Ann. § 61.003(3) (Vernon 1972) were arms of the state. *Ramos v. Texas Tech University*, 441 F.Supp. 1050 (N.D.Tex.1977), *affirmed on basis of opinion below*, 566 F.2d 573 (5th Cir. 1978); *Henry v. Texas Tech University*, 466 F.Supp. 141 (N.D.Tex.1979); *Hart v. University of Texas at Houston*, 474 F.Supp. 465 (S.D.Tex.1979); *Zentgraf v. Texas A & M University*, 492 F.Supp. 265 (S.D.Tex. 1980).

Our analysis will first examine the status of the Board of Regents of SFA under Texas law. In *Mt. Healthy*, the Supreme Court first considered the definitions provided under Ohio law for "state" and "political subdivision": "Under Ohio law the 'state' does not include 'political subdivision' and 'political subdivisions' do include local school districts. 429 U.S. at 280, 97 S.Ct. at 572. The district court omitted this particularly illuminating inquiry. Texas law provides: " 'state agency' means a university system or an institution of higher education as defined in section 61.003 Texas Education Code, other than a public junior college." Tex.Rev.Civ.Stat.Ann. art. 6252–9b(8)(B) (Vernon). By contrast, Texas statutory definitions of "political subdivision" typically exclude universities in the category of SFA. For example, Tex.Rev.Civ.Stat. Ann. art. 8309h states: "Political subdivision means a county, home-rule city, a city, town or village organized under the general laws of this state, a special district, a junior college district, or any other legally constituted political subdivision of the state."

Tracking *Mt. Healthy*, 429 U.S. at 280, 97 S.Ct. at 572, we next examine the state's degree of control over SFA, and SFA's fiscal autonomy. SFA was created by the legislature in 1921, and in 1969 was placed under the control of its own Board of Regents. Texas' statutes authorizing the operation of SFA and providing for its governance are codified at Tex.Educ.Code Ann. § 95.01 et seq. and § 101.01 et seq. These statutes provide that members of the Board of Regents are to be appointed by the Governor with the advice and consent of the

Senate. Tex.Educ.Code Ann. § 101.11. Texas also subjects SFA to some control by the Coordinating Board, Texas College and University System, which exercises broad managerial powers over all of the public institutions of higher learning in Texas. This Board consists of eighteen members appointed by the Governor with the advice and consent of the Senate. Tex.Educ.Code Ann. § 61.001 et seq.

SFA's Board has the power of eminent domain, but "the taking of the land is for the use of the state." Tex.Educ.Code Ann. § 95.30. The University's real property is state property, Tex.Rev.Civ.Stat.Ann. art. 601b § 1.02; cf. Walsh v. Univ. of Texas, 169 S.W.2d 993 (Tex.Civ.App.1942) and the funds used to purchase it were appropriated by the legislature from the general revenues of the state. Cf. Texas Tech College v. Fry, 278 S.W.2d 480 (Tex.Civ.App.1954). State law is the source of the University's authority to purchase, sell or lease real and personal property. See Tex.Rev.Civ.Stat. Ann. art. 601b. The University's operating expenses come largely through legislative appropriation. 1981 Tex.Sess.Law Serv. ch. 875 at 3695. Even those public funds which do not originate with the state, are reappropriated to the University, id. ch. 875 at 3720, and become subject to rigid control by the state when received. Id. ch. 875 at 3719–21. The source and use of the University's monies is governed comprehensively, id. ch. 875 at 3716–28 and all funds are subject to extensive reporting requirements and state audits. E. g., id. ch. 875 at 3721.

In addition to the functions cited above, because SFA is a state agency it is subject to state regulation in every other substantial aspect of its existence such as employee conduct standards, promotions, disclosure of information, liability for tort claims, worker's compensation, inventory reports, meetings, posting of state job opportunities, private consultants, travel rules and legal proceedings. See generally, 1981 Tex.Sess.Law Serv. ch. 875 at 3790–3824. Also Texas courts have held repeatedly that suits against Universities within SFA's classification are suits against the state for sovereign immunity purposes. Martine v. Board of Regents, State Senior Colleges of Texas, 578 S.W.2d 465, 469–70 (Tex.Civ.App.1979); Lowe v. Texas Tech University, 540 S.W.2d 297, 298 (Tex.1976). In short, under Texas law SFA is more an arm of the state than a political subdivision.

Despite this analysis of state law which so clearly demonstrates that ·Texas intends for SFA to be an arm of the state, the district court found SFA was a political subdivision. In Hillis, 486 F.Supp. 663, 670–72 (E.D.Tex.1980), rev'd, 665 F.2d 547 (5th Cir. 1981), the district court duly noted the Mt. Healthy analysis and our application of that analysis in Hander v. San Jacinto Junior College, 519 F.2d 273 (5th Cir. 1975) in which we found San Jacinto Junior College was not an arm of the State of Texas. That court proceeded, however, to a comparison of SFA with San Jacinto, finding that in some respects SFA was more like an arm of the state, and in some respects less. There are two problems with this process of analysis. First, it omits the initial Mt. Healthy inquiry—the definitional analysis which as clearly shows that "state agency" includes SFA, as that political subdivisions include San Jacinto Junior College. Second, while SFA and San Jacinto Junior College are both institutions of higher learning created by the State of Texas, they are treated by state law so differently that this surface similarity is meaningless. Junior colleges, rather than being established by the legislature, are created by local initiative. Tex.Educ.Code Ann. § 130.031. Their governing bodies are elected by local voters rather than being appointed by the Governor with the advice and consent of the Senate. Id. section 130.-083(e). Most telling is the power of junior colleges to levy ad valorem taxes, id. section 130.122, a power which the Board of SFA lacks. Under Texas law, political subdivisions are sometimes defined as entities authorized to levy taxes. Tex.Rev.Civ.Stat. Ann. art. 2351b–3. See generally, Hander, 519 F.2d at 279.

Hillis thought that Mt. Healthy indicated a reluctance in the Court to expand the scope of the eleventh amendment against

an entity which did not clearly fall within any regular branch of state government.[1] From that premise it reasoned that since a university was not ordinarily considered a branch of state government and the structural analysis of SFA's function was not entirely clear, the vindication of constitutional rights demanded that the court refrain from expanding the eleventh amendment. This reasoning is wrong. First, the *Mt. Healthy* Court expressed no reluctance to apply evenly the constitution. Indeed, it chose a wholly objective, state law based formula for determining whether an entity is an arm of the state. Second, application of the *Mt. Healthy* structural analysis to SFA results in a clear, not a close call. Third, the outcome cannot depend on the merits of the plaintiff's claims. The focus must be solely on the status of the defendant—either it is an arm of the state, or it is not. The proposition that a violation of constitutional rights might justify a contraction of the eleventh amendment has been flatly rejected by the Supreme Court. *See Quern v. Jordan*, 440 U.S. 332, 338–45, 99 S.Ct. 1139, 1143–47, 59 L.Ed.2d 358 (1979) holding that section 1983 did not abrogate the state's eleventh amendment immunity. *See also Jagnandan v. Giles*, 538 F.2d 1166, 1182–86 (5th Cir. 1976).

In the present case, the district court's inquiry began by noting that under Texas law, the Board of Regents at the time of filing this suit, could sue and be sued in its own name. This was taken as a statutory waiver of sovereign immunity. The entire statute, now repealed, read: "The board may sue and be sued in the name of the University. Venue is in either Nacogdoches County or Travis County . . . [L]egislative consent to suits against the university is granted." Tex.Educ.Code Ann. § 101.18 (repealed).

A waiver of the state's constitutional immunity must be clear and is not to be lightly inferred. *Edelman v. Jordan*, 415 U.S. at 678, 94 S.Ct. at 1363. Waiver may only be found where the waiver is express or the inference of waiver overwhelming. *Id.* Further, waiver for purposes of suit in state courts does not necessarily waive immunity for actions in federal courts. *Murray v. Wilson Distilling Co.*, 213 U.S. 151, 172, 29 S.Ct. 458, 465, 53 L.Ed. 742 (1909). *See Brennan v. Univ. of Kansas*, 451 F.2d 1287, 1290 (10th Cir. 1971). "[W]here a public instrumentality is created with the right 'to sue and be sued' that waiver of immunity in the particular setting may be restricted to suits or proceedings of a special character in the state, not the federal courts." *Petty v. Tennessee-Missouri Bridge Comm.*, 359 U.S. 275, 277, 79 S.Ct. 785, 787, 3 L.Ed.2d 804 (1959). The fixing of venue in Texas counties indicates strongly that the intended waiver applied to state court proceedings. In this way, the statute contrasts sharply with that relied on in *Soni v. Board of Trustees of the Univ. of Tenn.*, 513 F.2d 347 (6th Cir. 1975), *cert. denied*, 426 U.S. 919, 96 S.Ct. 2623, 49 L.Ed.2d 372 (1976) which provided that the trustees "could be sued in any court of law or equity in this state *or elsewhere.*" (Emphasis added). *See Long v. Richardson*, 525 F.2d 74, 76–79 (6th Cir. 1975), and *Jagnandan v. Giles*, 538 F.2d at 1177 (comparing Soni). *See also, An-ti Chai v. Michigan Tech College*, 493 F.Supp. 1137, 1162 (W.D.Mich. 1980); *Board of Regents v. Dawes*, 370 F.Supp. 1190, 1191–96 (D.Neb.1974). Accordingly, the district court's reliance on this statute to support a waiver of the eleventh amendment bar, was erroneous.

The district court's holding that the eleventh amendment does not bar suit against SFA is thus left to rely on one factor: that payment of an award can be made without resort to general revenues of the state or legislative appropriation. *See Edelman v. Jordan*, 415 U.S. at 664–65, 94 S.Ct. at 1356–57. In making this finding, the court relied heavily on the Board's power to issue bonds in the name of the university, Tex. Educ.Code Ann. § 55.13, and on the fact

---

1. Our opinion in *Hander v. San Jacinto Junior College*, 519 F.2d 273 (5th Cir. 1975) was cited as an example of abjuring such expansion.

that such bonds are *not* obligations of the State of Texas. *Id.* § 55.18. However, this finding overlooks a crucial point. The chapter authorizing the Board to issue bonds is entitled "Financing Permanent Improvements" and states that the bonds are "for the purpose of providing funds to acquire, purchase, contract, improve, enlarge and/or equip any property, buildings, structures, activities, services, operations or other facilities." *Id.* § 55.13. The Revisor's note states that the statute provides broad and flexible authority for campus construction financed by revenue bonds. Except for *Hillis,* no other decision holds that the proceeds of these bonds, earmarked for improvements to state owned lands, are available to pay judgments in civil rights cases. *See Vaughn v. Regents of University of California,* 504 F.Supp. 1349, 1354 n.7 (E.D. Cal.1981); *Selman v. Harvard Medical School,* 494 F.Supp. 603, 615 (S.D.N.Y.1980) (revenue bonds limited to establishing projects or acquiring lands for projects and thus damage award would not be paid through such bonds). In addition to bond revenues, the court found that SFA could itself pay such an award because it has substantial unappropriated, separately held, locally generated funds. The court listed the following such sources: earnings from investment of bond proceeds, "surplus funds" which are earnings in excess of bond retirement and sinking fund requirements, unexpended balances from construction revenue bonds, gifts and donations. The district court's construction of *Edelman v. Jordan* overlooks, however, our own construction of that case and other eleventh amendment jurisprudence in *Jagnandan v. Giles* forbidding refund of tuition fees unconstitutionally extracted from resident alien students at Mississippi State University.

The Eleventh Amendment was fashioned to protect against federal judgments requiring payment of money that would interfere with the state's fiscal autonomy and thus its political sovereignty. Retroactive monetary relief for the constitutional violations here would have just that effect. Mississippi has devised a complex statutory design which governs the state's schools of higher education and their control by the Board of Trustees. The Board is required to submit budgetary proposals for legislative acceptance. To require refund payments from the Board for overpayment of tuition fees would be the kind of tampering the eleventh amendment sought to avoid. 538 F.2d at 1176.

Thus, the eleventh amendment is not applicable only where payment would be directly out of the state treasury. *Wade v. Mississippi Co-op. Extension Service,* 424 F.Supp. 1242, 1257 (N.D.Miss.1976); *Vaughn v. Regents of University of California,* 504 F.Supp. 1349, 1353 (E.D.Cal.1981). The funds at issue in *Jagnandan* were separately held by the university, 538 F.2d at 1176, just as are the funds looked to by the district court.

In an apparent reference to *Jagnandan,* the district court asserted that the different kinds of separately held unappropriated funds at SFA are not "commingled" with each other or with appropriated funds as were the funds in *Jagnandan.* 538 F.2d at 1176. Our discussion of commingling in *Jagnandan* was but an example of how an award against MSU would interfere with the state's fiscal processes. Nothing in *Jagnandan* or in *Schiff v. Williams,* 519 F.2d 257 (5th Cir. 1975) suggests that commingling was the touchstone of the eleventh amendment analysis. Rather, *Jagnandan* applies the bar of the eleventh amendment to state-held funds, regardless of their source, or location, whenever payment would interfere with the state's fiscal autonomy. 538 F.2d at 1176. *Schiff* merely determined that under Florida law an award from a certain type of fund did not implicate the state's fiscal autonomy. 519 F.2d at 262. *See Wade v. Mississippi Co-op. Extension Service,* 424 F.Supp. at 1257. The key is not the ability to identify segregated funds, but the larger concept of jurisdiction over state sovereignty which the eleventh amendment proscribes.

The crucial question then, is whether use of these unappropriated funds to pay a damage award against SFA would interfere

with the fiscal autonomy and political sovereignty of Texas. The answer depends in part upon whether the court has jurisdiction to direct payment from the categories of unappropriated sources cited by the district court. *See Wade v. Mississippi Co-op. Extension Service,* 424 F.Supp. at 1257. Under Texas law, gifts of money to SFA are to be deposited in the state treasury and expended in accordance with the General Appropriations Act, 1981 Tex.Sess.Law Serv. ch. 875 at 3808. Texas statutes[2] clearly demonstrate that an award from any other local funds available to SFA would constitute the same sort of tampering as we barred in *Jagnandan v. Giles,* 538 F.2d at 1175–76. These local funds, collected under authority of state law, Tex.Educ. Code Ann. § 51.004, are either held in the Treasury or restricted as to use. In either event they are subject to audit and budget planning. Thus any award from those funds would directly interfere with the state's fiscal autonomy.

◼ Finally, the district court intimated that backpay was allowable as part of the "equitable" remedy of reinstatement. A backpay award against a state, whether viewed as damages for illegally terminated employment or as an aspect of equitable relief is retroactive in nature and is therefore barred by the eleventh amendment. *Hander v. San Jacinto Junior College,* 519 F.2d at 278. We hold, therefore, that the eleventh amendment bars this suit against the Board of Regents of SFA, the members thereof in their official capacity and the President of SFA in his official capacity. Accordingly, the claim based on breach of contract with the University must be dismissed, including also the claim for wrongful prevention of performance.

### Claims Against the Individual Defendants

The district court found defendants Steen, Lewis, Lenhart and Walker liable in their individual capacities for violations of Somberg's rights under the first and fourteenth amendments.

### First Amendment Claim

◼ The district court found that Somberg began speaking out concerning the misuse of research funds shortly after arriving at SFA, and that he continued making those allegations throughout his tenure there. Applying the *Mt. Healthy* test, 429 U.S. at 287, 97 S.Ct. at 576, the Court found

---

**2.** *Special Provisions Relating Only to State Agencies of Higher Education*

Sec. 10. Expenditure Provisions. The expenditure of the appropriations made and authorized for agencies of higher education by this Act, whether from the General Revenue fund, local institutional funds, or any other receipts and funds whatsoever, except bequests and gifts specifically designated to be in some manner handled otherwise, shall be subject to the provisions which follow hereafter:

a. Annual budgets. It is expressly provided that the governing board of each of the educational institutions named herein shall approve on or before September 1, 1981 and 1982, an itemized budget covering the operation of the ensuing fiscal year, which budget shall be prepared within the limits of the revenue available from legislative appropriations and estimated local and other funds. A copy of such budget, and any subsequent amendments thereto, shall be filed with the legislative library to be available for public inspection. Copies of each such budget shall also be filed with the Legislative Budget Board and the Governor's Budget and Planning Office.

b. Local Income from Educational Activities. The governing board of each of the general academic teaching institutions specified in this article shall deposit in the State Treasury all cash receipts from all sources except auxiliary enterprises, non-instructional services, matriculation fees collected in lieu of student activity fees, agency and restricted funds, endowment funds, student loan funds, and Constitutional College Building Amendment funds.

\* \* \* \* \* \*

e. All the funds deposited by each college or university as above provided are hereby appropriated in the respective institutions to be expended as provided in this Article ....

\* \* \* \* \* \*

i. Borrowing money. It is hereby declared the legislative intent that the governing boards and heads of the several state institutions of higher learning shall not borrow money from any person, firm, or corporation to be repaid out of local funds, other than as specifically authorized by legislative enactment.

1981 Tex. laws, ch. 875, pgs. 3719–3721.

that Somberg's conduct was constitutionally protected, that this conduct was a substantial, or motivating factor in the decision not to rehire him, and that the defendants failed to prove the same decision would have been reached even absent that protected conduct.

 The defendants' claim to qualified immunity: State officials, such as the defendants here, enjoy a qualified immunity when sued for damages in their individual capacity under section 1983. When this immunity is involved a plaintiff must prove that the defendants knew or reasonably should have known that they were acting in violation of the plaintiff's clearly established constitutional rights, or that the defendants acted with a malicious intention to harm the plaintiff or deprive him of his rights. *Procunier v. Navarette*, 434 U.S. 555, 562, 98 S.Ct. 855, 859, 55 L.Ed.2d 24 (1978); *Wood v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975). The defendants claim entitlement to this immunity on several grounds.

The "private criticism" defense: The defendants concede that Somberg spoke out, but assert that of the defendants, only Walker knew that Somberg was speaking to people outside the University. They claim that Steen, Lenhart and Lewis believed at the time of termination that Somberg's criticisms had been directed only at his superiors and solely within the university community. They argue therefore that since "private" criticism was not afforded protection until *Givhan v. Western Consolidated Schools*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979) Steen, Lewis and Lenhart could not "reasonably have known," that terminating Somberg on the basis of private criticism "violated the constitutional norm." *Wood v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975); *Procunier v. Navarette*, 434 U.S. 555, 562, 98 S.Ct. 855, 859, 55 L.Ed.2d 24 (1978). They allege further that the district court was clearly erroneous in finding that they were aware as of February 1974, the date Somberg was notified of his termination, that Somberg had gone outside the

university in voicing his criticisms, arguing that there is absolutely no support in the record for such a finding.

We need not decide whether these defendants would be liable if private criticism alone was involved here, since the record supports the district court's finding that they were aware that Somberg's criticism was being voiced in a non-private manner. This finding was based in part on credibility choices and circumstantial evidence, to which deference is due. *Blunt v. Marion Co. School Bd.*, 515 F.2d 951, 958 (5th Cir. 1975). For example, the district court credited Somberg's testimony that prior to being notified of his termination he was warned by Walker that he would lose his job if he didn't cease talking to people outside the School of Forestry concerning the use of research funds. Accordingly, the court could have found from circumstantial evidence that Lenhart knew also of these outside communications since he attended the meeting in February 1974 at which Walker notified Somberg of his termination. As to all of these defendants three undisputed facts support the district court's finding. First, Somberg began making his allegations almost immediately after joining the School of Forestry as Director of Research, and made them repeatedly throughout his stay there. Second, Somberg was willing to talk "to anybody that would listen" about misuse of research monies, and in fact had voiced these allegations to the individual defendants on a number of occasions. Third, by virtue of his position as Director of Research, Somberg was in constant consultation with officials outside the university concerning the use of research funds generally and most particularly their use in the McIntire-Stennis program. This was well known to the individual defendants. From this circumstantial evidence the court could have properly inferred that any claim of unawareness on the part of the defendants was implausible. Thus, the "private criticism" defense is unavailing.

The false speech defense: The defendants argue in the alternative that they met

the burden of proving they were entitled to qualified immunity because when they acted in February 1974 they were justified in believing that Somberg's allegations were false. This would mean his speech was unprotected, *Pickering v. Board of Education,* 391 U.S. 563, 572–74, 88 S.Ct. 1731, 1736–37, 20 L.Ed.2d 811 (1968) and that he had no clearly established first amendment rights. *See Procunier v. Navarette,* 434 U.S. at 562, 98 S.Ct. at 859. The defendant's argument that they believed Somberg's allegations to be false, and therefore unprotected, is based on investigations into those allegations supposedly conducted at the request of Lewis and Steen prior to the decision to terminate Somberg. These investigations assertedly showed no improprieties with regard to the use of research monies. The district court tacitly rejected this defense.

The defendants failed to offer any documentary evidence of the results of the audits allegedly conducted. Steen testified that audits were conducted, but this, without more, does not establish their position. The sole document referred to by any defendant is a report of a research program review conducted in January 1972 by Drs. Wylie and Post of the Department of Agriculture. Neither the review, nor the report of the review purported to focus on Somberg's allegations. Instead, it presented an examination of many, if not all, aspects of the research program at SFA. The report included critiques of the facilities and staff and made proposals concerning such items as planning and areas of research. Dr. Wylie was unable to recall during his testimony his exact conversations with Somberg during the course of the review at SFA. He did recall in general terms that Somberg had expressed his difficulties with aspects of research funding. The report does not establish that the School of Forestry correctly conducted its research programs. It contains no indication that such was the mission of the reviewers. If it contributes anything relevant, the report supports Somberg's concerns since it recommends obtaining the services of a bookkeeper for the purpose of maintaining records of research expenditures. In any event, the report offers no support for defendants' argument that Somberg's allegations were investigated and found to be untrue. In addition, we note that *Pickering* requires at least a showing that a teacher's false statements be knowingly or recklessly made before the statements may furnish a basis for dismissal. 391 U.S. at 574, 88 S.Ct. at 1737. No such assertion can be made here. The district court's failure to allow this defense was not clearly erroneous.

The disruption defense: The other theory upon which defendants based their claims to qualified immunity was that terminating Somberg did not violate the constitutional norm because his disruptiveness outweighed his interests in free speech. *Pickering,* 391 U.S. at 568–573, 88 S.Ct. at 1734–37. The district court found the defendants' proof did not establish that Somberg had a disruptive effect in the School of Forestry. The district court also found several indications that Somberg's performance met with approval. Somberg received three consecutive nine-month reappointments to the faculty of the School of Forestry, and never received any critical evaluations during that time. Moreover, in February 1972, Somberg was nominated by Walker to appear in the 1972 volume of *Outstanding Educators of America.* In October 1972 Walker sent Somberg a memorandum from Lewis commending the research work being done at the school and urging that they "keep up the good work." The court heard the testimony of a disinterested witness, Dr. Beney, an American Association of University Professors (AAUP) representative at SFA that Somberg's competence as a professor was unquestioned. The district court found also that after Somberg resigned to become Director of International Studies he had little contact with Walker, the man with whom the disrupting personality conflict had developed. The court found further that Somberg never publicly criticized Walker at any general or formal meeting of faculty members. *See Pickering,* 391 U.S. at 570, 88 S.Ct. at 1735.

The facts found by the district court narrow Somberg's potential for disruption, solely to his persistent allegations of misuse of research funds. The district court's holding that the proof failed to show Somberg's words so interfered with the operation of the institution as to justify terminating an otherwise competent teacher, *Pickering*, 391 U.S. at 574, 88 S.Ct. at 1737, was not clearly erroneous.

The defendants press one further defense: that Somberg was terminated because he had resigned as Director of Research. Their argument implies that Somberg was dropped to make room for a new director. The district court apparently rejected this theory, and correctly so. The fact that Somberg had resigned as Director of Research to assume a new post at SFA does not alter in any way the finding that Somberg's termination from that *new* post was substantially motivated by his first amendment exercise. Moreover, the record reveals that several vacancies arose in the School of Forestry, during this time. This negates any claim that Somberg was terminated to make room for an additional faculty member.

Our affirmance of the district court's findings does not extend, however, to the finding that these defendants acted with a malicious intention to deprive Somberg of his rights. *See Wood v. Strickland*, 420 U.S. at 322, 95 S.Ct. at 1000. The case on this issue is a close one. Somberg made statements both within and without the University community on a matter of public concern. These statements were ultimately borne out. While the defendants could not prove that Somberg's disruption in the operation of the School of Forestry outweighed his first amendment rights, all that can be said of their motive is that they "reasonably should have known" better. *See Perez v. Rodriguez Bou*, 575 F.2d 21, 23 (1st Cir. 1978). This record will not support any finding that the defendants acted with evil motive. Rather, it shows unquestionably they were motivated largely, if not entirely, by what they perceived to be the best interests of the University, though that does not constitute a defense to Somberg's action. *Schiff v. Williams*, 519 F.2d 257, 261 (5th Cir. 1978). Therefore, we affirm the district court's finding that the defendants were liable on the "reasonably should have known" prong of *Wood v. Strickland*. We intimate no view as to whether the defendants acted in good faith for the purpose of seeking indemnity under Texas law in Texas courts. Tex.Rev.Civ.Stat.Ann. art. 6252–26, § 1(a)(2).

*Fourteenth Amendment*

■ Somberg claimed, and the district court found, that the initial letter offering employment, the faculty handbook, and Somberg's fourth year appointment notice combined to create a valid, nonsubjective expectation of continued employment, that entitled Somberg to a hearing concerning his termination.[3] Based on these same criteria, the court also found that Somberg had acquired tenure at SFA and could not be terminated without good cause.

---

**3.** The initial letter offering employment to Somberg stated that

> The first three years of employment constitute a probationary period. If a mutually satisfactory situation exists at the end of three years, tenure is granted. SFA's policy is based on AAUP standards. We are sending you under separate cover a copy of the Faculty Handbook and a copy of the current University Bulletin.

With respect to tenure the Faculty Handbook stated:

> Tenure means assurance to an experienced faculty member that he may expect to continue in his academic position unless adequate cause for dismissal is demonstrated in a fair hearing, following an established procedure of due process.

> Normally a faculty member can expect tenure after his third year of satisfactory service with the university. If probationary appointment is extended beyond the third year, the extention will be specified in the appointment for the fourth year ....

In April 1972, during Somberg's second year of employment, the Faculty Senate revised the tenure policy to state that

> A faculty member cannot expect tenure until after his third year of satisfactory service with the university. At the end of each year until the end of his probationary period, the faculty member will have his service and status at this institution reviewed by his department head.

Although the district court's findings that this series of events operated to confer tenure may be correct as a matter of contract law, they fall short of supporting a constitutional challenge. *Megill v. Board of Regents*, 541 F.2d 1073 (5th Cir. 1976). As we noted in *Megill*, this court does not sit to review a university's tenure decisions. 541 F.2d at 1077;[4] *Blunt v. Marion County School Bd.*, 515 F.2d 951, 956 (5th Cir. 1975). *See Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968). In deciding Somberg's fourteenth amendment claim our only function is to determine whether the denial of tenure violated Somberg's rights. *Megill*, 541 F.2d at 1077. Assuming Somberg "proved" his case for tenure, this court has no place in the controversy absent a constitutional challenge. *Id.* No such constitutional challenge is made here. While Somberg's termination was substantially motivated by his first amendment exercise, the denial of tenure had nothing to do with those activities. The change in tenure policy by the Faculty Senate, and the tenure moratorium by the Dean's council were university-wide in scope. Somberg was not singled out for denial of tenure. *See Stone v. Board of Regents*, 620 F.2d 526, 529 (5th Cir. 1980). In the absence of a constitutional challenge, it was improper to review SFA's refusal to grant tenure to Somberg. *Bishop v. Wood*, 426 U.S. 341 at 350, 96 S.Ct. 2074 at 2080, 48 L.Ed.2d 684; *Megill v. Board of Regents*, 541 F.2d at 1077.

The issue of whether Somberg's termination without notice and hearing violated his rights of procedural due process hinges, of course, on whether, as the district court found, he had a legitimate claim of entitlement to continued reemployment. *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). However, in the context of this case, where Somberg was accorded a full hearing in

district court and awarded complete back-pay relief on his first amendment claim, it is unnecessary for us to resolve this issue. *Ferguson v. Thomas*, 430 F.2d 852, 858 (5th Cir. 1970); *Decker v. North Idaho College*, 552 F.2d 872, 874 (9th Cir. 1977).

*Attorney's Fees*

The district court awarded Somberg attorney's fees as a joint and several judgment against all of the defendants in the suit, based on *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). Unquestionably the status of the law at present is that the eleventh amendment bars a section 1983 damage action which would expend itself against the state, *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Quern v. Jordan*, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979), but does not bar an award of attorney's fees against the state where a plaintiff has prevailed in a suit for prospective injunctive relief against a state official. *Hutto v. Finney*, 437 U.S. at 694, 98 S.Ct. at 2575.

Here, Somberg sued for prospective injunctive relief in the form of reinstatement, as well as for retrospective monetary relief. He prevailed on both counts in the district court, and although his death mooted the order of reinstatement, our affirmance of the district court on the first amendment question makes it clear he was entitled to reinstatement. Therefore, the award of attorney's fees and costs including those stipulated on appeal against the state and the individual defendants is appropriate. The total amount of attorney's fees to be awarded is $43,668.00.

*Implied Cause of Action Under Texas Penal Code*

In addition to the constitutional claims the district court found the defend-

---

4. *Megill* quoted from *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) "[i]n the absence of any claim that the public employer was motivated by a desire to curtail or to penalize an employee's constitutionally protected rights, we must presume that official action was regular, and if erroneous, can best

be corrected in other ways. The Due Process clause of the fourteenth amendment is not a guarantee against incorrect or ill-advised personnel decisions ... [states] may withhold tenure at their unfettered discretion." 426 U.S. at 349–50, 96 S.Ct. at 2079–80.

ants liable on an implied cause of action under Tex. Penal Code Ann. § 39.02 which states:

> (a) A public servant acting under color of his office or employment commits an offense if he:
>
> \* \* \* \* \* \*
>
> (2) intentionally denies or impedes another in the exercise or employment of any right, privilege, power or immunity, knowing his conduct is unlawful.
>
> \* \* \* \* \* \*
>
> (c) An offense under this section is a Class A demeanor.

While we harbor grave doubts about the propriety of implying a cause of action under state law in the absence of any state court precedent,[5] we need not decide that question. Holding that the individual defendants "should have known" they were violating the constitutional norm does not establish that they acted intentionally in violating Somberg's rights. Our reversal of the district court's holding that these defendants intentionally deprived Somberg of his lawful rights necessarily defeats any claim under this statute.

*Damages*

The defendants attack the award of compensation that Somberg would have received for employment during the 1975–77 summer sessions. Rather than being speculative, this award is based on evidence that

Somberg worked each summer session during the time he was employed at SFA. So too the award of the value of a group life insurance policy was proper. It was based on evidence that Somberg could not obtain insurance after his termination, and on evidence of the cost of similar coverage if he had been insurable. We affirm the district court's damage findings.

AFFIRMED IN PART, REVERSED IN PART.

---

**5.** Neither the district court nor the plaintiffs cite us to any Texas decision implying a cause of action under this statute. *Compare, e. g., American Bank and Trust Co. v. Barod Staff Securities Corp.*, 335 F.Supp. 1276 (S.D.N.Y. 1972) (relying on state court decisions implying causes of action). In fact the state courts in Texas appear to disfavor implying remedies not spelled out in the statute: "Where a statute creates a right and provides a remedy for its enforcement, the remedy is exclusive ...." *McGregor v. Clawson*, 506 S.W.2d 922 (Tex. Civ.App.1974); *Mingus v. Wadley*, 115 Tex. 551, 285 S.W. 1084 (1926).

*Hogenson v. Williams*, 542 S.W.2d 456, 458 (Tex.Civ.App.1976) cited by plaintiffs is inapposite. It does not imply a cause of action, but merely states that the definition of assault is the same whether it is the subject of a criminal

prosecution or a civil suit for damages. The exclusiveness of statutory remedy comes into play where the cause of action derives from statute alone, and not from the common law. See *McGregor v. Clawson*, 506 S.W.2d at 928.

The reliance of the district court and the plaintiffs on *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) is likewise misplaced. *Cort* and its progeny concern private rights of action implied from federal statutes. See e. g., *Noe v. Metropolitan Rapid Transit Authority*, 644 F.2d 434 (5th Cir. 1981). Indeed, the fourth prong of *Cort's* four-part test asks "is the cause of action one traditionally relegated to state law, in an area basically the concern of the states, so that it would be inappropriate to infer a cause of action based solely on federal law." *Cort v. Ash*, 422 U.S. at 78, 95 S.Ct. at 2087.